Jean Carter POWELL, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Supreme Court of Kentucky.

July 29, 1977.

James H. Polsgrove, Kenny Grantz, Louisville, for appellant.

Robert F. Stephens, Atty. Gen., Carl T. Miller, Jr., Asst. Atty. Gen., Frankfort, for appellee.

PALMORE, Justice.

Jean Carter Powell appeals from a judgment sentencing her to 15 years in prison pursuant to a verdict finding her guilty of 1st-degree manslaughter under an indictment charging her with the murder of William Frederick Silver. Cf. KRS 507.020, 507.030. She contends that the evidence was not sufficient to support a conviction and that the trial court erred in denying her the opportunity of presenting evidence of a suicidal disposition on the part of Silver.

We are of the opinion that the evidence, though by no means overwhelming, was sufficient to justify submission to the jury, but that the court erred in rejecting the testimony in question.

The fatal incident occurred shortly before midnight of March 20, 1975, in the living room of Mrs. Powell's home in the west end

of Louisville. Only she and Silver were in the house at the time, and the .38-caliber pistol with which he was shot belonged to her. A Harrison-Gilroy test of samples swabbed from her hands shortly after the incident disclosed one minute particle of lead on the back of her right hand. An expert described this finding as "consistent" with the hand's having been used in discharging a firearm. A similar analysis of swabs applied to the victim's hands at the hospital two days later, after his death, resulted in negative findings (as might be expected, considering the hospital care that would ordinarily be assumed to have taken place during the interim). Only one fingerprint was found on the gun, and it did not have sufficient points of similarity to match it with any of Mrs. Powell's prints.

Silver was shot in the head behind the right ear. Mrs. Powell called the police, and when they arrived they found Silver lying face up on a couch, which had been opened out so as to make a double bed. There is no doubt that the wound could have been self-inflicted. The revolver with which he had been shot lay on the floor under a coffee table next to the couch.

Aside from these physical details the only direct evidence of what happened consisted of Mrs. Powell's statements to the investigating officers and her testimony at the trial.

Mrs. Powell was 56 and Silver was 28 years of age. Silver, a native of Hartford, Connecticut, had been blind from birth. He played the piano for a living. Mrs. Powell was a widow whose husband had died in 1971. She lived alone. She and Silver became acquainted through a "lonely hearts" club. Their initial communications were through telephone conversations between Louisville and Hartford, culminating in a visit by Silver to Mrs. Powell's home in April of 1974. He made another such visit in July and then came back in August to stay, making his home with Mrs. Powell. As best we can characterize it in a few words, their relationship (Mrs. Powell described her feelings toward Silver as "ambiguous") was something more than platonic but less than conjugal. Silver joined a musicians' union and Mrs. Powell helped him find a job playing the piano at a prominent Louisville restaurant.

According to Mrs. Powell, she and Silver slept together sometimes but not always. For physiological reasons they were unable to have sexual intercourse, and she preferred that they just be friends. In time, she thought it would be better for him to leave, so that each of them could take up a life of his or her own, but he reacted violently to the suggestion, and said on several occasions that he would never leave the front door alive. They had a conversation about it on Monday before the Wednesday night on which he was shot. Then on Wednesday night, says Mrs. Powell, "I was more emphatic, and I asked him to go home because I said I just wanted my freedom, and I wanted to resume a life of my own." As on previous occasions, Silver said that he would not leave the front door alive. During the conversation, which apparently continued off and on during the course of the evening, Silver had the pistol in his possession and pointed it at his head from time to time. This too was not entirely unprecedented, as explained by Mrs. Powell: "Well, on different occasions we did have discussions about this [Silver's leaving], and sometimes he'd say 'Oh, okay. I'll go back home,' and then I would find him sitting in the living room with the gun in his hand to his head, and I always thought it was a threat just to hold on."

The pistol had been purchased by Mrs. Powell's husband in 1969. She said that she had fired it but once, in 1972 or 1973, when some boys snatched her purse and she shot over their heads to make them stop. Since her husband's death in 1971 Mrs. Powell had made it a habit to carry the gun with her whenever she went out. For some period of time before Silver's death she had been leaving it on the coffee table in the front room for protection in the event of a break-in, explaining that her purse had been snatched four times outside and that there had been illegal entries into the house itself.

On the night of March 20, 1975, after they had been discussing his leaving her, Silver wanted Mrs. Powell to accompany him to the restaurant where he worked (she had an automobile), but she did not want to go and suggested that he use a taxi. She was in something of an ill humor anyway, having had some difficulties in rewinding a typewriter ribbon, but then she changed her mind about staying home, at which point, in her words, events proceeded as follows:

"So, then he said 'You told me to go,' or something of the kind, and I said 'Bill, let's don't start another argument,' or something, I don't recall exactly the words that were said, not exactly . . . . Well, again it all added up to one thing. I asked him to go home again, and I was very emphatic about it, and he said he would never leave the door alone (sic) again, and I said 'Oh, yes, every time we have an argument you're going to shoot yourself,' and I turned—(pause— witness weeping)—I turned and walked part way into the dining room by the telephone when I heard what didn't even sound like a shot, it was like a muffled puff, and at first I thought he pretended, and I thought maybe the bullet went through one of my paintings. He was laying down but I expected him to move . . . . . And then I heard the blood falling on the floor . . . I fell apart, completely apart. I ran over to him, and I lost my balance but I turned his head over with my hand . . . . . I called the police and I think they called the Emergency. I don't know. I was almost hysterical."

When the police arrived Mrs. Powell identified herself as Mrs. Silver, later explaining this little white lie as follows: "I was so terribly upset. Possibly I did, but I was embarrassed because Mr. Silver was 28 years old and I was 56 . . . . . I was humiliated because Mr. Silver was staying in my house." She admitted to the investigating officer that she and Silver had been arguing, and when he asked her what the argument was about she replied that it resulted from her telling Silver she wanted a divorce, or, as she puts it, "wanted her freedom." She denied having shot Silver.

The witness George Morentz (or Morens), called in Mrs. Powell's behalf, testified that he resided near Hartford, Connecticut, and that Silver had lived in his home for about 1½ years before moving to Louisville. He and his wife met Silver at an Easter party in 1971. Some time afterward Silver came to live with them and played the piano in a ballet studio operated by Mrs. Morentz. This relationship terminated in February of 1974, but on the Commonwealth's objection the witness was not permitted to describe the circumstances under which Silver left the Morentz home. Counsel for Mrs. Powell then continued his interrogation:

Q– "Let me ask you this, did Mr. Silver ever discuss with you the possibility of committing suicide?"

A– "Yes, he did."

MR. HUME [prosecuting attorney]: "Your honor, I have agreed to stipulate this. Here is a stipulation that states that twice before this he made such an attempt or some such thing. It has nothing to do with . . . here is a stipulation signed."

THE COURT: "You wanted to stipulate it and now you don't want to stipulate it?"

MR. POLSGROVE [defense counsel]: "No, I want to stipulate it."

THE COURT: "Then we're not going to be repetitious."

MR. POLSGROVE: "It won't be repetitious."

THE COURT: "Let me see you in chambers . . . ."

REPORTER'S NOTE: "After a short conversation in chambers, which by direction was not made a part of this record, proceedings continued . . . ."

The remainder of this witness's testimony was directed to subjects other than Silver's suicidal tendencies. The stipulation mentioned in the exchange quoted above was introduced after one more witness had appeared, and it read as follows:

"It is hereby stipulated by the Commonwealth's Attorney's office that the decedent, William F. Silver, made two previous

attempts to take his life prior to March 20, 1975.

"It is further agreed, between the parties hereto that this Stipulation shall be read to the Jury and considered as evidence in the trial of this case."

At the end of the day, following the introduction of this stipulation and another brief appearance on the witness-stand by Mrs. Powell, defense counsel informed the court that he wished to use a character witness but could not have him present until the next morning and would like to have the trial recessed until then. The court responded, "No sir, we are going to finish this case tonight," whereupon counsel said he guessed he could close without the witness. We continue with the transcript:

THE COURT: "You want to close your case? You're satisfied?"

MR. GRANTZ [of counsel for the defense]: "I want to renew some motions and maybe make some others."

MR. POLSGROVE: "Can we perhaps get an avowal in the record in the morning?"

THE COURT: "You can put it in there, but you've closed your case."

MR. POLSGROVE: "It's simply an avowal."

THE COURT: "No, I'm not going to let you do that. Do you all agree that this jury can separate tonight?"

After the court had admonished the jurors and dismissed them for the night, a motion for a directed verdict of acquittal was offered and denied, following which counsel for Mrs. Powell made this statement for the record:

"The Deféndant offered to place an avowal in the record of this case as to the testimony that would be given by George Morentz (or Morents) if allowed to testify but the court disallowed the making of such avowal prior to the closing of the Defendant's case."

The foregoing statement having been made to and in the presence of the court, and there being nothing in the nature of an exception to it other than a parry from the prosecuting attorney to the effect that the stipulation referring to Silver's suicide attempts had been read to the jury, we presume it to be correct—that is, that the trial court denied Mrs. Powell the opportunity of preserving, by way of avowal, what the witness Morentz would have said.

In his affidavit filed in support of a subsequent motion for new trial counsel for Mrs. Powell reiterated that the court had refused to permit an avowal and that if Morentz had been allowed to testify further he would have said this:

"The witness would further have testified that Wailliam [sic] F. Silver had made repeated attempts on his life, plus other threats to kill himself whenever Morentz or his wife suggested that William Silver remove himself from the premises and find himself a new home. Whenever the security of Silver was threatened is when he would make actual attempts on his own life. In addition, whenever a discussion was had with Silver that seemed unfavorable to his liking he would make threats and gestures indicating that he (Silver) would violently dispose of himself.

"The last time Silver attempted suicide at Morentz's home, he was taken into custody by the Police and held by them for two weeks until a home could be found for him.

"The witness would have further testified that Silver was an inmate of Norwich Mental Hospital in Norwich, Connecticut for several months and his review of the hospital records at that institution (copies of which he had in court with him) indicated that Silver had suicidal tendencies and recited at least one incident of an attempt to destroy himself."

We have narrated these trial proceedings in what may seem to be excessive detail for the reason that the answer to each of the arguments made in Mrs. Powell's behalf depends on a close analysis of the facts.

■ The evidence to justify a finding of guilt was very thin indeed. However, Mrs. Powell did have a motive for killing Silver, which in a fit of anger or desperation could have overcome her scruples against it.

That the shooting came on the heels of an argument between them is admitted. Normally, when an argument between two people ends in the violent death of one of them it is administered at the hands of the other, suicide being an exception and a deviation from the usual course of human affairs. Though perhaps true, Mrs. Powell's testimony that she had been keeping the gun on the coffee table where Silver had easy access to it did not have to be believed by the jury. The slight trace of lead found on her right hand was an additional straw in the wind, though we are inclined to regard as almost without probative value the expert's opinion that it was "consistent with" her having fired the weapon—which, after all, is simply another way of saying that it was *not inconsistent* with her having done so. The only damaging conclusion that could possibly have been drawn from the fingerprint evidence was that Mrs. Powell may have wiped the gun off to obscure the fact that the only fingerprints on it were hers alone, but that would be pure speculation. Many things can happen to fingerprints on a weapon between the time it is picked up and the time it is later examined in a laboratory. Mrs. Powell's pathetic pretense at first that she was Silver's wife had no bearing on the question of whether she had killed him. Nevertheless, in the absence of the testimony that might have been given by the witness Morentz but was excluded, it is our opinion that the evidence as a whole was sufficient to justify submission to the jury.

We expressly leave open the question of whether the Morentz testimony would have tilted the balance the other way. That will be for the trial court to determine in the first instance in the light of the evidence heard in the retrial of the case, assuming that the disputed testimony is then produced.

█ Evidence of a suicidal disposition is analogous to evidence of threats or bad feeling which is admissible as tending to show who was the aggressor when self-defense is claimed in a homicide case. When suicide is the theory of defense the dece-

dent's previous threats or attempts to kill himself are admissible for the same reason. As this court said in *Marcum v. Commonwealth*, 308 Ky. 740, 215 S.W.2d 846, 847 (1948), "the great weight of authority is to the effect that in prosecutions for homicide the deceased's declarations or threats indicating a suicidal disposition, if made within a reasonable time before his death, are not within the hearsay rule and are admissible unless the facts preclude the possibility of suicide." See Wigmore on Evidence (3d ed.), § 143, and annotation at 83 A.L.R. 434.

█ RCr 9.52 permits the introduction of an avowal in order that it can be determined on appeal whether the proffered testimony should have been admitted and, if so, whether its exclusion was prejudicial. The right thus to preserve a claim of error is essential to the right of appeal. If a party is forbidden the opportunity of making an avowal he is to that extent deprived of the remedy of appeal, to which he is entitled as a matter of right. Ordinarily a motion for new trial is not a timely method of preserving testimony that has been improperly excluded, but when the aggrieved party has been denied the opportunity of making an avowal it is about the only way in which he can get it in the record. Even, however, had there been no affidavit showing what the witness would have said, or if the affidavit had been controverted, still it would be necessary to treat the trial court's refusal to permit the avowal as a prejudicial error, because the testimony of the witness himself, under oath and subject to examination and cross-examination, is the only sure indication of what would have been said in the presence of the jury.

█ It would appear from the colloquy between court and counsel concerning the rejected evidence that the prosecuting attorney was under the impression that the stipulation made the testimony unnecessary. Ordinarily, we think, the reverse would be true. Stipulation or no stipulation, here was a live witness, on hand and ready to give a first-hand eyewitness account of events relevant to the issue being tried. It had not been stipulated that

this evidence would not be introduced, and we do not know that it would make any difference if it had. In any event, the stipulation certainly did not have the effect of rendering the evidence inadmissible.

The judgment is reversed with directions for a new trial.

All concur.