ELDEN E. FRIEDEMAN, WIDOWER OF BETTY E.
FRIEDEMAN, INDIVIDUALLY AND AS NEXT FRIEND OF
DAVID EARL FRIEDEMAN AND DOREEN RAE
FRIEDEMAN, APPELLEE, V. STATE OF NEBRASKA,
BEATRICE DEVELOPMENTAL CENTER, APPELLANT.
ELDEN E. FRIEDEMAN, PERSONAL REPRESENTATIVE OF
THE ESTATE OF BETTY E. FRIEDEMAN, DECEASED,
APPELLEE, V. STATE OF NEBRASKA, BEATRICE
DEVELOPMENTAL CENTER, APPELLANT.
339 N.W.2d 67

Filed October 7, 1983. Nos. 82-416, 82-417.

Paul L. Douglas, Attorney General, and John R. Thompson, for appellant.

Herbert J. Friedman of Friedman Law Offices, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ., and GRANT, D.J.

WHITE, J.

This is an appeal by the State of Nebraska from the decision of the three-judge Workmen's Compensation Court which reversed a judgment of the single-judge court. The three-judge court determined that the employee suffered a compensable injury and was totally disabled until her death by her own hand. In the companion case, submitted together, the State appeals from the judgment of the compensation court, holding that the widower and next of kin were entitled to death benefits on account of decedent's death, which the court held arose out of and in the course of her employment at the Beatrice State Developmental Center, and that decedent was not "willfully negligent" in procuring her own death.

The State assigns as error: (1) That the evidence does not support the finding that the decedent was temporarily totally disabled for a period of 154$\frac{1}{7}$ weeks; (2) In failing to find that the decedent's suicide was "willful negligence," thus barring any recovery for death-related benefits; (3) In finding that the death of the decedent arose out of and in the course of her employment; and (4) In admitting into evidence a suicide note. We affirm.

A detailed recitation of the facts is necessary. Betty E. Friedeman (hereafter decedent) was, on September 1, 1977, a married woman of 44 years of age and the mother of four children. On that day, while employed as an attendant at the Beatrice State Developmental Center, an institution for the housing, care, and training of the mentally retarded,

she suffered an injury to her lower back while attempting to restrain a patient. Decedent was treated by an orthopedic surgeon, undergoing two myelograms and a laminectomy. She was examined by neurologists and ultimately two psychiatrists. All treatment was apparently unavailing.

Decedent's husband and two of her children testified. According to their testimony, the decedent was a healthy, vigorous, active, friendly, and industrious woman prior to the accident of September 1, 1977; she did chores around the farm; she was always on the go; she enjoyed her children and had an active, normal relationship with her husband. After the accident she was a completely changed person. Her husband, daughter, and son each testified that she chronically complained of pain and had a difficult time moving around. She had trouble climbing stairs, walking, and sleeping. She would walk the floor at night because of the pain in her back. During the day, she spent most of her time lounging on a couch, because it hurt her to walk, to stand, and to sit. She stopped doing the housework and, for the most part, was a mere shadow of her former self.

The decedent worked from the time of the injury up to September 12, 1977, and was off work until October 30, 1977. She again started working in October 1977 and worked up till May 15, 1978, when she had her operation.

In the early morning of March 9, 1981, decedent took an overdose of drugs and a half bottle of vodka, left a poignant suicide note, and died. The note stated as follows: "Dear Family: Please forgive me. I just cannot stand the pain any longer. I have been thinking about doing this for the last year or more.

"Please do not feel bad because I hope I will have no more pain.

"I love you all very much.

"But you have your lives and I cannot live mine day after day in pain.

"Always remember I loved you all with all my heart." Signed: "Mom & Betty."

The autopsy reports by Dr. Harlan Papenfuss indicate death by suicide.

Dr. Bruce Miller and Dr. Eli Chesen both testified in person. Dr. Miller testified that decedent was consistently in pain and appeared to be depressed. He had referred her to Dr. Fisher, a psychologist, and Drs. Robert Osborne and Eli Chesen, psychiatrists, because of her psychological depression. Dr. Miller testified that decedent was totally disabled from returning to her employment at the Beatrice State Developmental Center from May 15, 1978, the time of the second operation, up until the time of her death, March 9, 1981.

Dr. Chesen, who saw decedent approximately 4 weeks before her death, testified that in his opinion the cause of death was the pain, caused by the back injury, which drove her to commit suicide. Dr. Chesen stated that she was not psychotic but that she did make a conscious decision to end her life. He stated both on direct and cross-examination that, although she was lucid, the suicide was beyond her control and was not voluntary.

On direct examination Dr. Chesen testified as follows: "THE WITNESS: It was my opinion after reviewing the autopsy, suicide note, and my own previous notes, that she had taken her own life or suicided in response to the pain from which she was suffering. Q. (By Mr. Friedman) And do you, again, have an opinion based upon a reasonable degree of medical certainty as to what was the cause of her suicide? A. Yes. . . . THE WITNESS: It was my opinion that the suicide was caused or was a response to the pain. . . . In this situation, I felt that while there certainly were depressive elements here that depression, at least in my opinion, was not the primary cause of this tragic event but rather the pain from which this woman was suffering. Again, people suicide for a large variety of reasons, depres-

sion being only one, one of them, and possibly explaining only a minority of them even. Q. Based on the history that you took from her, do you have an opinion as to what caused the pain? A. Yes. Q. And what's that? . . . A. After reviewing the medical records and just given all the data that I had to go on, and inclusive of my interview, I feel that with a reasonable degree of medical certainty that the pain was caused by the injury that Mrs. Friedeman had suffered previously. Q. And was this then, the suicide, in your opinion, a direct result of that? A. Yes. Q. Doctor, in your opinion, was Mrs. Friedeman really able to control herself in the sense of a decision to take her life? . . . THE WITNESS: I think based on, again, based on all of the information, including the information subsequent to my own examination, that this was beyond her control.''

In discussing the assignments of error we apply the standard that findings of the Workmen's Compensation Court on rehearing have the same force and effect as a jury verdict and, if supported by sufficient evidence, will not be disturbed on appeal unless clearly wrong. *Caradori v. Frontier Airlines*, 213 Neb. 513, 329 N.W.2d 865 (1983).

The first assignment of error is clearly without merit. There is evidence that the decedent suffered an accident arising out of and in the course of her employment; that she incurred an injury; that, except for a short period of reemployment, she was totally disabled to the date of her death; and that the pain and depression were causally connected to the accident and injury, based on a reasonable medical certainty. The State's arguments are directed to the weight of the evidence and to the credibility of witnesses, something that was within the province of the compensation court to weigh and consider. We will not again reweigh the facts.

We will discuss the next two assignments together.

The threshold question underlying consideration of the assigned errors is whether employee suicide ab-

solutely disqualifies a survivor from receiving benefits under the Nebraska workmen's compensation law. We previously have said that it does.

In *Hannon v. J. L. Brandeis & Sons, Inc.*, 186 Neb. 122, 181 N.W.2d 253 (1970), at issue was whether the decedent leaped from a parking structure, thereby committing suicide, or whether in the absence of proof to the contrary the presumption against suicide applied and the survivors were entitled to benefits. The court, in determining that the burden was on the survivors to prove a natural death, observed almost in passing that "[a]n employee who is willfully negligent cannot recover under the workmen's compensation law. § 48-101, R. R. S. 1943. An employee who commits suicide is willfully negligent within the meaning of the act." *Hannon, supra* at 126, 181 N.W.2d at 256.

Since this appears to be a distinct minority view in the United States, prudence requires that we reexamine that issue to determine if we should continue to adhere to it. The State and the survivors have furnished us with comprehensive briefs on this subject.

The status of suicide as a work-related death has been the subject of considerable litigation. An extensive discussion of the subject is had in 1A A. Larson, The Law of Workmen's Compensation § 36.10 et seq. (1979).

Although not cited in *Hannon v. J. L. Brandeis & Sons, Inc., supra*, the decision by the *Hannon* court would seem to be in agreement with the rule set forth in *Sponatski's Case*, 220 Mass. 526, 530, 108 N.E. 466, 467-68 (1915): "This decision rests upon the rule established in *Daniels v. New York, New Haven, & Hartford Railroad, supra* [183 Mass. 393, 67 N.E. 424 (1903)]. That rule applies to cases arising under the workmen's compensation act. It is that where there follows as the direct result of a physical injury an insanity of such violence as to cause the victim to take his own life through an un-

controllable impulse or in a delirium of frenzy 'without conscious volition to produce death, [without] having knowledge of the physical nature and consequences of the act,' then there is a direct and unbroken causal connection between the physical injury and the death. But where the resulting insanity is such as to cause suicide through a voluntary wilful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act even though choice is dominated and ruled by a disordered mind, then there is a new and independent agency which breaks the chain of causation arising from the injury."

As Larson observes at § 36.21 at 6-121: "Armed with this formula, courts plunged into the murky depths of every conceivable kind of broken and anguished mind, and tried to come up with the cases classified as compensable or not, according to whether the employee killed himself through a voluntary (though insane) choice or through a delirious impulse."

*Sponatski* then is a two-part test, whether the suicide was the result of an uncontrollable impulse and was accomplished without conscious knowledge of the physical consequences. Under this doctrine the State argues, and the survivors seem to agree, that recovery for decedent's death would be barred, as the evidence was quite clear that the decedent was lucid, thus knowing the physical consequences that would result.

Larson at § 36.22 at 6-123 attacks the inclusion of the second prong in a determination of causation: "It is abundantly evident that the second element is traceable to the criminal law test of insanity in *M'Naghten's Case*. But there is a decisive difference between the role of 'insanity'.in criminal law murder cases and in workmen's compensation suicide cases. It can well be argued in a criminal case that the accused's *understanding* is a crucial element, since it is necessary to the establishment of

*mens rea* or criminal intent. But in the compensation suicide defense, the only legal issue is causation, and that in turn depends on the *will*, not on the understanding. If the injury so acts upon the will that it is not operating independently at the time of the suicide, then the chain of causation is clear, since there is no independent intervening cause. Whether the decedent knew the physical consequences of his act is utterly irrelevant to this question of causation. Using *Sponatski's* own words, if the injury produced a literally uncontrollable impulse to suicide, how can causation theory demand more? Postulate that the decedent as a result if [sic] his injury was driven by an uncontrollable impulse to produce what he understood perfectly well was his own physical death. To say that such an act was causally independent of the injury is to defy the plain meaning of words.''

As discussed by Larson at § 36.22, it appears that, since *Sponatski*, only one case in the last 25 years has used the knowledge of the physical consequences test to defeat recovery. *Zimmiski v. Lehigh Val. Coal Co. et al.*, 200 Pa. Super. 524, 189 A.2d 897 (1963). The *Sponatski* rule has itself been reversed legislatively. 1937 Mass. Acts ch. 370, § 2.

A second test was set forth by the New York courts in *Matter of Delinousha v. Nat. Biscuit Co.*, 248 N.Y. 93, 94, 161 N.E. 431 (1928): ''[I]f an injury causes insanity which in turn causes suicide, death benefits may be awarded . . . .''

The presence or absence of a brain derangement, however that term is interpreted, is critical to recovery under this theory. While there is evidence of depression and possibly melancholy at the time of decedent's suicide, no claim of brain derangement or psychosis is made. We agree with the State that recovery could not be had under the evidence in this case if we were to apply the theory of the *Delinousha* case.

The third test, known as the chain of causation

test, would allow recovery if the injury and its consequences directly caused the employee to lose normal judgment and to be dominated by a mental disturbance. Larson, *supra* at § 36.30.

Our Neb. Rev. Stat. § 48-101 (Reissue 1978) bars recovery if the employee was "willfully negligent." Was the act of the decedent willfully negligent? In *Delaware Tire Center v. Fox*, 411 A.2d 606, 607 (Del. 1980), the court commented on "willful intention." "Common experience demonstrates the effect of serious injury, pain, depression and despair, and the medications prescribed for them, can influence one's thinking and override one's will, to the end that suicide, though undertaken with knowledge of its nature and consequences, is not an act of the free will but rather a direct product of the incapacity. This influential effect should be recognized in our Workmen's Compensation law, a remedial statute with a benevolent purpose long subject to liberal construction."

Florida also has a statutory provision which bars recovery if the injury was a result of the employee's willful intention to injure or kill himself. In construing the meaning of "willful intention" the Supreme Court of Florida stated: "The difficulty inherent in proving that one who kills himself by his own hand does so because of injuries sustained in an accident, and as a direct and proximate result thereof, undoubtedly accounts for the diversity of opinion on this question among the courts of this country. And, clearly, in a proper case, the provisions of Section 440.09(3), supra, should be given full force and effect so that industry should not have to carry the burden of compensating for a death for which it was in no wise responsible. But we are not persuaded that the fact that a workman *knew* that he was inflicting upon himself a mortal wound will, in all cases, amount to a 'wilful intention' to kill himself, within the meaning of the statute. We believe that in those cases where the injuries suffered by the

deceased result in his becoming devoid of normal judgment and dominated by a disturbance of mind directly caused by his injury and its consequences, his suicide cannot be considered 'wilful' within the meaning and intent of the Act.

"There is no force to the argument, propounded by some courts, that the act of suicide is an independent intervening cause of the death of the workman, thus breaking the chain of causation from the injury to the death of the deceased. While it may be an independent intervening cause in some cases, it is certainly not so in those cases where the incontrovertible evidence shows that, without the injury, there would have been no suicide; that the suicide was merely an *act* intervening between the injury and the death, and part of an unbroken chain of events from the injury to the death, and not a *cause* intervening between the injury and death." *Whitehead v. Keene Roofing Co.*, 43 So. 2d 464, 465 (Fla. 1949).

We are of the opinion that scientific testimony of factors that can override a person's will, to the extent that even the knowledge of the consequences of the act of suicide do not prevent the act from taking place, are admissible to demonstrate that the act was not willful. Such was the direct testimony of Dr. Chesen. It is elementary that an act which is not voluntary is also not willful. We are further persuaded that to the extent that *Hannon* holds that a nonvoluntary act of suicide constitutes willful negligence, it should be overruled.

The last assignment deals with the reception of the suicide note in evidence. The evidence was admissible. The note was found at the time the body was discovered and was written by the decedent within 24 hours of her death. Dr. Chesen testified that the declaration was relevant in forming his opinion concerning decedent's state of mind at the time it was written and as to the cause of death.

The Supreme Court of Illinois, when faced with a

similar question, also held that a suicide note was admissible as a declaration of present state-of-mind exception to the hearsay rule. *City of Streator v. Industrial Com.*, 92 Ill. 2d 353, 444 N.E.2d 164 (1982).

The statement is not unlike the declaration of present state of mind and intent we found to be admissible in *Fite v. Ammco Tools, Inc.*, 199 Neb. 353, 258 N.W.2d 922 (1977). Further, we held in *Fite* that the compensation court may receive in evidence matters not properly admissible in other courts bound by the rules of evidence.

The judgment of the Workmen's Compensation Court is affirmed. Counsel is allowed a $1,250 attorney fee for services in this court.

AFFIRMED.

BOSLAUGH, J., dissents.

CAPORALE, J., dissenting.

I must respectfully dissent from that portion of the opinion which overrules *Hannon v. J. L. Brandeis & Sons, Inc.*, 186 Neb. 122, 181 N.W.2d 253 (1970), and affirms the compensation court's award of benefits to the widower and next of kin on account of the decedent's death by her own hand. In doing so I acknowledge that the majority's rationale is well reasoned and is supported by respectable authority. My problem arises from the fact that the question presented is not one of first impression.

Neb. Rev. Stat. § 48-101 (Reissue 1978) provides, as it did at the time of *Hannon*, that one who is "willfully negligent" may not recover benefits under the Workmen's Compensation Act. Whether observed "almost in passing" or otherwise, the fact remains that this court ruled, with three members dissenting on the question of what presumptions should arise from an unexplained death, that an employee who commits suicide is "willfully negligent." With that ruling, suicide became a bar to the recovery of workmen's compensation benefits. During the intervening dozen years, our Legislature has elected to let its language remain unchanged and has

thereby acquiesced in this court's determination of its intent. *Erspamer Advertising Co. v. Dept. of Labor*, 214 Neb. 68, 333 N.W.2d 646 (1983).

With all due respect to the learned Professor Larson, he is not the Legislature of Nebraska. Nor, no matter how sound and persuasive their reasoning, are the courts of our sister states empowered to construe Nebraska's legislative enactments.

The nature of suicide has not changed in the past 12 years and, at least so far as the majority demonstrates, mankind's understanding of the phenomenon has not markedly improved. The only thing that has changed is the composition of this court. That circumstance alone, I respectfully submit, does not justify the abandonment of precedent.

HASTINGS, J., joins in this dissent.