No. 80,691

STATE OF KANSAS, *Appellee*, v. ROGER DRACH, *Appellant*.

(1 P.3d 864)

Opinion filed March 10, 2000.

*Jack Focht*, of Foulston & Siefkin L.L.P., of Wichita, argued the cause, and *Richard L. Marquez*, of Lindner & Marquez, of Garden City, was with him on the brief for appellant.

*Lois K. Malin*, assistant county attorney, argued the cause, and *John P. Wheeler, Jr.*, county attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Roger Drach, from his convictions for first-degree murder, aggravated battery, and criminal use of weapons. Drach's wife Deanne was the victim. Drach was sentenced to a minimum term of 25 years in prison.

Drach appeals, raising five issues. Drach argues the trial court erred when (1) it would not allow a board-certified psychiatrist to testify that a note found in the house was a suicide note; (2) it failed to find the assistant county attorney had a conflict of interest; (3) it allowed Karen Althaus to testify as a rebuttal witness for the State; (4) it admitted testimony of Drach's prior bad acts; and (5) it violated the Confrontation Clause of the United States Constitution by admitting res gestae evidence.

Deanne died on August 19, 1994, as a result of a gunshot wound to the chest. This case was not commenced until nearly 2 years after her death. The main issue at trial was whether Deanne had committed suicide or had been murdered by Drach.

Drach claimed Deanne committed suicide, that he was not in the room when she was shot, and that he found her on the bed after he heard the shot. The State's expert witnesses testified the wound could not have been self-inflicted. Drach's expert witnesses testified they were 99.5% certain the wound was self-inflicted.

Drach does not challenge the sufficiency of the evidence. Thus, we need not review the evidence. We will set forth the facts of this case, however, as necessary in discussing the issues.

We take time to comment that Drach's statement of facts is not keyed to the record in many instances and when keyed it is a general cite such as pages 8-107, 149-180, 56-106, 3-39, 20-74, 5-123, 6-164, etc. By rule, we are allowed to assume there is no evidence in the record to support that part of the case that is not properly keyed to the record. Supreme Court Rule 6.02(d) (1999 Kan. Ct. R. Annot. 33).

After review of the extensive record (18 volumes, the longest of which is 291 pages), two relevant facts emerged: Deanne had an affair 28 years before her death, and she had been abused since her husband discovered the affair shortly after it occurred.

At trial, there was much hearsay evidence of abuse suffered throughout the 34-year-marriage, none of which is pinned down by time or date.

When Deanne's body was examined at the scene, she was on the bed in the southeast corner of the room. The gun that was used to shoot her was in the northwest corner of the room. The gun was a derringer. Both parties' experts testified the bullet had been fired from the top barrel. Yet, the top barrel had a live round with a dented primer in it and an empty cartridge in the bottom chamber.

Both old and new blood stains consistent with Deanne's blood were found throughout the house, in Deanne's purse, in her clothing, and in Drach's car, which would indicate Deanne had been abused for a long period of time.

When Deanne's body was examined, she was lying in fresh blood but had dried blood on her arms and back. She had a 2.5 centimeter laceration on the back of her head that went to the bone, two black eyes, a laceration above the right eye, and bruises all over her body. X-rays revealed new fractures of the 9th, 10th, and 11th ribs.

Two autopsies revealed old fractures of the 7th, 10th, 11th, and 12th ribs on the right side; a healing fracture of the left ulna; a fracture of the right arm that had recently been refractured; and a gunshot wound to the left arm.

Drach gave accounts of what happened that did not appear to be accurate. For example, in discussing a broken window, Drach said he had to break into the house because he did not have his key. Law enforcement officers testified the window was broken from the inside out. Drach testified that Deanne had facial bruises when he checked her out of the hospital. Three witnesses testified, however, that Deanne had no visible marks on her when they last saw her, including the discharging nurse at the hospital.

Drach also said he thought Deanne was drinking again when she died. The autopsy report showed her blood alcohol concentration was .000. Drach also told officers Deanne got her gun out of *her* car the day she was shot. Her car was in storage at Dodge City at all pertinent times and had been for some time.

## I. WRITING

During trial, Drach sought to place Dr. Tim McBath, a board-certified psychiatrist, on the stand to give his opinion that a writing found on the dryer in the Drachs' home after Deanne's death was a suicide note. Outside the presence of the jury, the trial judge heard testimony offered by Drach to determine if Dr. McBath's testimony was admissible under the Frye test.

Dr. McBath testified he was frequently called upon to examine writings to determine if they were suicide notes (if the writer says he or she is going to commit suicide, it is classified as a suicide note), and to determine if the note is a cry for help or a person who is planning to commit suicide. In about one-half of the writings, Dr. McBath does not have the opportunity to examine or talk to the author of the writing. He also had reviewed hospital and medical records where Deanne had expressed a wish for death and had suicidal thoughts.

The trial judge thought it was a *Frye* issue and made a preliminary ruling that Drach had not shown a basis for his opinion as generally acceptable as reliable within the expert's particular scientific field. The trial judge was influenced by the fact that Dr. McBath stated that he had never testified in court as to his opinion whether a writing was a suicide note, whether the author of the

writing was serious or merely calling for help, and he did not know of any doctor who had.

The trial judge then held that Dr. McBath's testimony would not be admitted in the absence of some evidence establishing that "scientific evidence is accepted in his area, that it has been admissible and received in other courts." The trial judge left the door open for additional evidence or citations. None were forthcoming.

Numerous courts have ruled on suicide notes and suicide threats. In *Powell v. Commonwealth of Kentucky*, 554 S.W.2d 386 (Ky. 1977), the court held:

> "When suicide is the theory of defense the decedent's previous threats or attempts to kill himself are admissible for the same reason. As this court said in *Marcum v. Commonwealth*, 308 Ky. 740, 215 S.W.2d 846, 847 (1948), 'the great weight of authority is to the effect that in prosecutions for homicide the deceased's declarations or threats indicating a suicidal disposition, if made within a reasonable time before his death, are not within the hearsay rule and are admissible unless the facts preclude the possibility of suicide.' See Wigmore on Evidence (2d ed.), § 143, and annotation at 83 A.L.R. 434."

See IA Wigmore on Evidence §§ 143 and 144 (2d ed. 1983); *Ott v. State*, 160 Ala. 29, 49 So. 810 (1909); *State v. Kelly*, 77 Conn. 266, 58 A. 705 (1904); *Nordgren v. People*, 211 Ill. 425, 71 N.E. 1042 (1904); *Hall v. State*, 132 Ind. 317, 31 N.E. 536 (1892); *State v. Meyer*, 180 Iowa 210, 163 N.W. 244 (1917); *State v. Beeson*, 155 Iowa, 355, 136 N.W. 317 (1912); *State v. Cater*, 100 Iowa, 501, 69 N.W. 880 (1897); *Epperson v. Commonwealth*, 227 Ky. 404, 13 S.W.2d 247 (1929); *State v. Ilgenfritz*, 263 Mo. 615, 173 S.W. 1041 (1915); *Sharp v. State*, 115 Neb. 737, 214 N.W. 643 (1927); *People v. Gehmele*, 1 Sheld. 251 (N.Y. 1871); *State v. Prytle*, 191 N.C. 698, 132 S.E. 785 (1926); *Blackburn v. State*, 23 Ohio St. 146 (1872); *Crow v. State*, 89 Tex. Crim. 149, 230 S.W. 148 (1921).

A clear majority and nearly all cited jurisdictions hold that evidence of suicide is admissible as tending to show the decedent's state of mind. Although these cases do not address the exact issue raised in the present case, they do indicate that evidence of a suicide theory can be admitted and that the jury is capable of determining its validity and attaching the proper weight.

There are also courts which have allowed testimony from experts who have read the suicide note and determined the "insanity" of the decedent in an insurance context. See *Garmon v. General American Life Ins. Co.*, 624 S.W.2d 42, 45-46 (Mo. App. 1981) (affirming trial court's admission of testimony by expert who determined based upon a reading of the suicide note that decedent was insane at time of his death); *Friedeman v. State*, 215 Neb. 413, 339 N.W.2d 67 (1983) (holding expert could testify as to decedent's state of mind after examining language used in suicide note); and *Brooks v. Travelers Insurance Company*, 515 S.W.2d 821, 823-24 (Mo. App. 1974) (holding expert could testify that decedent was sane at time he wrote suicide note and took his life).

Experts can be used to testify whether a decedent committed suicide if they testify regarding whether a wound is self-inflicted. These types of cases are abundant. See, *e.g., People v. Cole*, 47 Cal. 2d 99, 301 P.2d 854 (1956) (allowing expert pathologist to testify whether victim shot herself after performing an autopsy on her, while noting that a number of jurisdictions allow evidence as to whether a wound could have been self-inflicted); *State v. Mattatall*, 603 A.2d 1098 (R.I. 1992) (holding trial court did not err when it admitted testimony of assistant medical examiner who stated that, based on autopsy and investigation of scene of death, decedent died by act of homicide and not self-inflicted injury); and *State v. Richardson*, 158 Vt. 635, 603 A.2d 378 (1992) (allowing medical examiner to testify that victim died by homicide and not by suicide).

Here, the writing is described in a number of places in the record as being 12 pages in length. There is also an indication it may be two pages in length. The writing was introduced at trial, so it was read by the trial judge and jury. It is *not*, however, a part of the record on appeal.

A paragraph of the writing was read to the jury which stated:

"I'm sorry that it has come to this, Roger. Everyone was so glad to hear we were back together and could go on with our lives. Since we were . . . [unreadable portion] . . . but were really thrilled. You believed everything except me. I'm sorry you feel like I'm doing nothing but lying to you, but what I've told you is true. I can understand your feelings because of all the inter-

ference and lies by David and Dora, but I'm not lying to you. I do love you and really thought things had a chance with us when we left Wichita, but that was only wishful thinking. I'm sorry for this Roger, but I meant it when I said I'm scared. How many times have you said, just die and I wish you were dead? I'm a pretty low and Goddamned person, but if I grant the only wish you've asked of me, maybe at least you can get on with your life."

The above writing was part of a notebook. Drach was free to present the suicide defense to the jury and did so. It is impossible to have a meaningful review of this limited issue without having all of the writing. Based on the record before us, Drach did not meet his burden of proof, and we cannot say reversible error occurred on this issue.

## II. CONFLICT OF INTEREST

Drach claims that Robert Johnson, the assistant county attorney prosecuting this case as second-chair, was privy to confidential information significant to this case and that this created an inherent conflict of interest worthy of disqualification. Drach claims that he only became aware of the conflict when Althaus was called to testify on rebuttal. Drach had not remembered his involvement with Johnson until then. Drach made a motion for a mistrial when Karen Althaus was called to the stand to testify. He also moved for a new trial, arguing that Johnson should have been disqualified from second-chairing the case. Specifically, Drach claims that Johnson violated Kansas Rule of Professional Conduct (KRPC) 1.9 (1999 Kan. Ct. R. Annot. 329). The rule states:

"RULE 1.9 Conflict of Interest: Former Client

"A lawyer who has formerly represented a client in a matter shall not thereafter:
(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client or when the information has become generally known."

In *Lansing-Delaware Water District v. Oak Lane Park, Inc.*, 248 Kan. 563, 572, 808 P.2d 1369 (1991), we set forth the standard of review in attorney disqualification matters and stated:

"When the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law."

Our review of conclusions of law is unlimited. *Gillespie v. Seymour,* 250 Kan. 123, 129, 823 P.2d 782 (1991).

In disqualification matters which involve KRPC 1.9, the burden of proof is on the party alleging the violation. *Chrispens v. Coastal Refining & Mktg., Inc.,* 257 Kan. 745, 756, 897 P.2d 104 (1995); KRPC 1.9 Comment (1999 Kan. Ct. R. Annot. 329). In this case, the burden of proof is on Drach to show that a violation of KRPC 1.9 occurred and that Johnson should have been disqualified from assisting in the prosecution of the case.

Prior to coming to the Finney County Attorney's office, Johnson was in private practice. In early 1996, Deb West, Deanne's sister, called Johnson seeking representation in Deanne's probate case. Johnson agreed to represent West and filed an answer to a petition to open Deanne's estate. The petition was dismissed because it had been improperly filed. Johnson did not perform any more work for West after the dismissal of the petition. On March 26, 1996, Johnson notified West that he would no longer be able to represent her in the probate matter as he had taken a job with the Finney County Attorney's office. The parties agreed that at no time did Johnson expressly represent Drach. Drach did, however, speak with Johnson over the phone on two occasions. The first phone call concerned Drach's guarantee of West's attorney fees. Drach called Johnson a second time to find out why the retainer was so high. Drach contends that during the second phone call he provided Johnson with confidential information which Johnson then used during the trial to convict Drach. Drach testified that he told Johnson:

"I related to him, because I was pretty upset about that damn David [Deanne's brother who was attempting to be named executor of the estate], what's he doing to us now. I said I've got 90-some people that signed papers that I didn't ever do anything to my Deanne. And now all at once, attorneys, attorneys and bills and bills.

. . . .

"I said, I've only had one infraction on my marriage about 25 years ago in Hutchinson, Kansas when we lived there. And that's the only infraction in my entire marriage that I really did have.

. . . .

"I said I only had one thing ever happen to me, and I used the word I think infraction, in my marriage in the 34 years I've been married to her, and that was in Hutchinson, Kansas. And there's 90-some people that has been talked to and they testified or will testify or sign note papers or whatever, I kind of glanced through, that they have never saw me hit Deanne, never this Mickey Mouse, not one bit of it."

Drach contends that the information relayed in the phone call to Johnson enabled Johnson to locate Althaus. Althaus testified at trial on rebuttal that her husband had an affair with Deanne approximately 25 years ago when the Drachs lived in Hutchinson. Drach alleges that this testimony was pivotal to his conviction for the death of Deanne. Johnson testified that he had no recollection of the substantive content of either of his phone calls with Drach.

In order for KRPC 1.9 to apply to this case, there must be a determination that Johnson represented Drach. *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 266 Kan. 1047, 1053, 975 P.2d 231 (1999). An attorney-client relationship can either be by express agreement or implied. 266 Kan. at 1053. Johnson expressly represented West, Drach's sister-in-law, in the probate proceedings surrounding Deanne's death. Although no formal attorney-client relationship was ever formed between Drach and Johnson, Drach may have divulged confidential information to Johnson during the course of the second phone call. The information, admittedly, is more than a little vague and its usefulness questionable. According to Drach's testimony, he never revealed anyone's name to Johnson who may have been involved in Deanne's affair, only that an "infraction" occurred when they lived in Hutchinson.

The question remains whether Drach and Johnson had an implied attorney-client relationship. In *Associated Wholesale Grocers, Inc.*, this court recently stated:

" ' "The authority of an attorney begins with his retainer; but the relation of attorney and client is not dependent on the payment of a fee, nor is a formal contract necessary to create this relationship. The contract may be implied from conduct of the parties. The employment is sufficiently established when it is shown

that the advice and assistance of the attorney are sought and received in matters pertinent to his profession." [Citation omitted.]" 266 Kan. at 1053 (quoting 7 Am. Jur. 2d, Attorneys at Law § 136).

See also *Professional Service Industries, Inc. v. Kimbrell*, 758 F. Supp. 676, 682 (D. Kan. 1991) (noting that an attorney-client relationship begins when the client seeks and receives personal legal advice from an attorney). Drach did not believe that Johnson was his attorney. Drach did not call Johnson for the purposes of obtaining representation. Drach did not seek legal advice from Johnson. Drach's only purpose in calling Johnson was to discuss the retainer that West would be paying to Johnson in the probate litigation. Drach did not divulge any "confidential" or useful information. Drach testified it was common knowledge about town that his wife had an affair while the couple lived in Hutchinson. Drach testified that the county attorney's office knew about the affair before he had divulged the information to Johnson. Althaus called the county attorney after she read about trial testimony in a newspaper.

The comment to KRPC 1.9 states that "the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client." KRPC 1.9, Comment (1999 Kan. Ct. R. Annot. 329).

We hold that Drach did not meet his burden in proving that an implied attorney-client relationship existed with Johnson. Because Drach and Johnson were never in an express or implied attorney-client relationship, there can be no violation of KRPC 1.9. Furthermore, even if Drach and Johnson were in a confidential relationship, the testimony by Drach reveals that nothing told to Johnson was confidential.

### III. REBUTTAL EVIDENCE

Rebuttal evidence is limited to issues placed in conflict by the adverse party. *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 742, 822 P.2d 617 (1991). When determining whether rebuttal evidence should have been admitted during trial, our standard of review is an abuse of discretion standard. "The use and extent of rebuttal

rests in the sound discretion of the trial court and its ruling will not be reversed unless it appears the discretion has been abused to a party's prejudice." *State v. Weigel*, 228 Kan. 194, Syl. ¶ 9, 612 P.2d 636 (1980). Judicial discretion is abused and will be overturned by an appellate court only when no reasonable person would take the view adopted by the trial court. *State v. Stallings*, 262 Kan. 721, Syl. ¶ 6, 942 P.2d 11 (1997).

Althaus' testimony was used to refute testimony presented in Drach's case in chief in which witnesses stated that they had never seen Drach act in a violent manner toward Deanne. The State produced Althaus who testified that she had seen Drach threaten Deanne's life and the life of Althaus and her husband some 25 years ago when they were living in Hutchinson.

This court has consistently held that prosecuting attorneys are not required to disclose or endorse names of rebuttal witnesses. *State v. Trotter*, 245 Kan. 657, 660, 783 P.2d 1271 (1989); *State v. Hunter*, 241 Kan. 629, 638, 740 P.2d 559 (1987); *Talley v. State*, 222 Kan. 289, 292, 564 P.2d 504 (1977). Because the purpose of a rebuttal witness is to refute testimony given in the case in chief, it would be hard to list rebuttal witnesses in advance, not knowing exactly what detailed testimony may be elicited during the case in chief.

Drach presented at least 12 witnesses during his case in chief who testified that they had never seen Drach act in any violent manner toward Deanne. The trial court allowed Althaus to testify, finding that her testimony was warranted to refute Drach's case in chief and to show that Drach had previously threatened Deanne's life and threatened to kill himself. Althaus testified that she and her husband were good friends of the Drachs and that one night Drach had come to the Althaus residence at 1 a.m., pounding on the door and holding a pistol to Deanne's head. Drach insisted that Althaus' husband admit that he had an affair with Deanne. Drach held the pistol to Deanne's head and made her swear on a Bible that she only had sex once during the affair. Althaus testified that Drach hit Deanne several times during this altercation. Drach threatened to kill Deanne. Drach ordered Deanne to call her parents, confess her affair, and tell them good-bye. Drach told his in-

laws that if they wanted to see Deanne alive they would have to get to Hutchinson before 6 a.m.

Despite the fact that Althaus' testimony may have surprised Drach, the testimony is admissible, absent a showing of an abuse of discretion. Drach was aware of his own past and presumably would have remembered the significant events to which Althaus testified. Drach's trial strategy was to show that he had never been violent toward Deanne. A reasonable person would assume that the prosecution would try to refute that testimony. A minimal amount of questioning by Drach's attorneys should have revealed that Drach had previously held Deanne at gunpoint in the presence of the Althauses, even though the events occurred years ago. Furthermore, the record reveals that it was Althaus who contacted the State and not the other way around. Althaus contacted the county attorney's office after the trial had begun and after she had seen an article concerning the trial in the newspaper. While a 25-year-old occurrence would ordinarily not be admissible, it is shown this event is a common theme causing problems throughout this marriage. We cannot say that the trial court abused its discretion in allowing Althaus to testify as a rebuttal witness.

Drach also argues that the State should have disclosed its intent to put Althaus on the stand pursuant to *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). The United States Supreme Court in *Brady* held that due process rights are violated when the prosecution withholds evidence favorable to an accused which is "material either to guilt or to punishment." 373 U.S. at 87. Here, the evidence was not "favorable" and not of an exculpatory nature; thus, it does not fall within the ambit of *Brady*. This argument is without merit.

## IV. PRIOR BAD ACTS

Great deference is given to a trial court's determination of the admissibility of evidence. Generally, appellate review on questions of admissibility of evidence is governed by an abuse of discretion standard of review. *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could

differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *State v. Gardner*, 264 Kan. 95, 103-04, 955 P.2d 1199 (1998).

Drach argues that evidence of his prior bad acts was erroneously admitted at trial. This evidence consisted of statements Deanne made to others about beatings she had suffered at the hands of Drach and also testimony from others who saw bruises and cuts on Deanne. Drach argues that Deanne's statements were inadmissible hearsay and that the other testimony was inadmissible evidence of prior bad acts.

Because Drach's brief lacks any reference to any specific testimony complained about concerning this issue, we must look to the brief submitted by the State for some assistance. The State's brief suggests what type of testimony that Drach may be complaining about. Approximately 2 months before her death, Deanne went to St. Catherine's Hospital in Garden City. Deanne was inebriated, barefoot, not wearing her broken glasses, and her hair was in disarray. Drach was arrested for domestic battery. Deanne told Family Crisis Services workers, who testified at trial, that Drach had threatened her life. They also testified that Deanne had related to them that Drach had often beat her over the years and had repeatedly threatened her life over an affair that she had over 25 years previous. Deanne also reported to the workers that she had suffered broken ribs and arms over the years. Deanne further told the workers that she had been shot in the shoulder by Drach on a previous occasion. The workers observed a scar on Deanne's shoulder. Deanne told the workers that Drach had forbid her from seeking medical attention for most of these injuries.

Deanne related the same facts to a counselor in Dodge City who testified at trial. The counselor testified that Deanne had told her about times when Drach hit her in the face, stomach, and arms.

Approximately 1 month before her death, Deanne was admitted to St. Joseph's Hospital in Wichita. A doctor testified that he noticed scars about her face and arms. Deanne told him that Drach had caused the scars.

Although the trial court admitted the evidence on the basis of res gestae, the evidence was admissible on other independent

grounds. Kansas courts have consistently allowed evidence of "marital discord" in cases similar to this. Evidence of marital discord can include several types of evidence: Oral and written statements made by the deceased spouse relating their abuse; evidence of scarring, bruising, bleeding, and other physical manifestations of the abuse; testimony by others who saw the couple fighting, arguing, or otherwise in conflict; and statements by the defendant relating that he or she will kill his or her spouse. This testimony may fall under the traditional notion of hearsay or evidence of prior bad acts, yet still be admitted.

In *State v. Hedger*, 248 Kan. 815, 811 P.2d 1170 (1991), the defendant was convicted of killing his wife. On appeal, the defendant argued that the trial court erred when it admitted testimony relating prior acts of violence against his wife. The defendant had been arrested for beating his wife and kicking her in the face in one instance and had broken a van window while attempting to get at his wife in another. Despite the fact that the testimony consisted of prior bad acts of the defendant, the *Hedger* court held that the evidence was admissible and noted that Kansas appellate courts have "repeatedly held that evidence of a discordant marital relationship is admissible, independent of the statute, to show the ongoing relationship between the parties." 248 Kan. at 820.

In *State v. Taylor*, 234 Kan. 401, 673 P.2d 1140 (1983), the defendant objected to the introduction of his deceased wife's notebook which contained notes concerning their marital counseling and relating to how she felt when the defendant became outraged and angry. The trial court admitted the notes contained in the notebook. On appeal, the defendant argued that the evidence should not have been admitted as it was evidence of prior bad acts in contravention to K.S.A. 60-455. The *Taylor* court affirmed the trial court and noted that evidence of marital discord is admissible where a family relationship exists in order to show a continuing course of conduct between the parties or to corroborate the testimony of a complaining witness. The *Taylor* court stated:

"The rule in Kansas is that in a case of marital homicide, evidence of a discordant marital relationship and a wife's fear of her husband's temper is competent as bearing on the defendant's motive and intent. The court did not err in admitting

into evidence Shirley Taylor's letters which contained statements of marital discord and her fear of the defendant's temper since they showed the relationship of the parties and their conduct in the relationship." 234 Kan. at 408.

In *State v. Wood*, 230 Kan. 477, 638 P.2d 908 (1982), the defendant attempted to keep out testimony from his deceased wife's mother which concerned a telephone conversation that she had with her daughter about 7 hours before her daughter was killed. A neighbor also testified that he had seen the defendant throw his pregnant wife to the ground and drag her into their bedroom while holding a loaded .22 caliber gun 4 months before her death. The neighbor testified that the defendant had told him that he was going to "blow his old lady's head off" about 2 weeks before she died. All three types of testimony, the description of prior bad acts, the hearsay, and the statement by the defendant, were admitted at trial, and the ruling of the trial court was affirmed on appeal. The *Wood* court noted:

"It is the rule in Kansas that in a case of marital homicide, evidence of a discordant marital relationship, and of the defendant's previous ill treatment of his wife, including his prior threats to kill her, is competent as bearing on the defendant's motive and intent. [Citations omitted.] Clearly, evidence of prior threats showing that the defendant had the intent to kill his wife was relevant on the issue of defendant's intent as it existed at the time the homicide occurred. It was admissible independently of K.S.A. 60-455." 230 Kan. at 479-80.

For other cases allowing evidence of marital discord, independent of the "prior bad acts" exclusion or a "hearsay" exclusion, see *State v. Green*, 232 Kan. 116, 121, 652 P.2d 697 (1982) (allowing a witness to testify that defendant had thrown a hatchet at his wife and other evidence of marital altercations while noting that evidence of marital discord is admissible where used to show defendant's motive and intent); *State v. Fenton*, 228 Kan. 658, 667-68, 620 P.2d 813 (1980) (allowing testimony that deceased had sought court order for protective custody after defendant had thrown butcher knife at her; allowing testimony that deceased had told sheriff's wife that defendant had threatened her; and allowing testimony of psychiatrist who related that deceased had told him about her marital problems); *State v. Anicker*, 217 Kan. 314, 316, 536 P.2d 1355 (1975) (allowing testimony that relatives had often

seen the deceased with black eyes and bruises all over her body; testimony that defendant would often lose his temper with deceased; and testimony that defendant had threatened deceased's life while noting that "[f]rom early times" appellate courts have held evidence of marital discord is admissible when it has a bearing on intent of defendant); and *State v. Patterson*, 200 Kan. 176, 182, 434 P.2d 808 (1967) (allowing testimony that defendant had threatened his wife's life as evidence of marital discord as it had a bearing on defendant's motive and intent and noting that evidence was especially necessary since it was case of marital homicide).

Hearsay statements made by a deceased spouse-declarant are admissible as evidence of marital discord if the trial court finds that the statements have particular guarantees of trustworthiness. See *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980).

## V. CONFRONTATION CLAUSE

Drach argues res gestae evidence is violative of the Confrontation Clause of the United States Constitution. The evidence complained of is admissible under the marital discord exception. Drach's argument under this issue is moot. The evidence was admissible, and the trial court did not abuse its discretion in allowing the evidence of marital discord.

Affirmed.

SIX, J., concurring: In section IV, the Prior Bad Acts portion of the opinion, the majority notes the trial court relied on res gestae in admitting certain testimony. I agree with the majority's rejection of res gestae as a rationale for admission. I write separately in a continuing effort to encourage trial courts to analyze this type of evidence under K.S.A. 60-460, the approach intended by the legislature's codification of our evidentiary rules. See Arguello, *The Marital Discord Exemption to Hearsay: Fact or Judicially Legislated Fiction*, 46 Kan. L. Rev. 62, 113 (1997). Although Drach does not brief the specific testimony complained of, it may have been admissible under K.S.A. 60-460(d)(3). Res gestae, as an independ-

ent evidentiary concept, deserves a proper burial. See *State v. Edwards,* 264 Kan. 177, 203, 955 P.2d 1276 (1998) (Six, J., concurring).