No. 78,075

FLORA BARRAGREE, *et al.*, *Appellees*, v. TRI-COUNTY ELECTRIC COOPERATIVE, INC., *Appellant.*

(950 P.2d 1351)

Opinion filed December 12, 1997.

*Ken W. Strobel,* of Williams, Strobel, Malone, Mason & Ralph, P.A., of Dodge City, argued the cause and was on the brief for appellant.

*Jeffrey L. Carmichael,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Jana D. Abbott,* of the same firm, and *Terry E. Cordes* and *Gary S. Hess,* of Cordes & Hess, of Meade, were with him on the brief for appellees.

The opinion of the court was delivered by

SIX, J.: This is an attorney disqualification case. The law firm of Sharp, McQueen, McKinley, Dreiling & Morain, P.A. (Sharp, McQueen), of Liberal, Kansas, has been disqualified from representing Tri-County Electric Cooperative, Inc., (Tri-County) in defending against damage claims by plaintiffs Chris, Loyd, and Bobbie Smith (Smiths) arising from a range fire on the Smiths' property. Our jurisdiction is under K.S.A. 20-3018(c) on a transfer from the Court of Appeals of an interlocutory appeal.

We address, for the first time, a Model Rules of Professional Conduct (MRPC) 1.7(a) (1997 Kan. Ct. R. Annot. 297) and MRPC 1.9(b) (1997 Kan. Ct. R. Annot. 304) civil litigation disqualification claim. We consider two issues. Did the district court err in finding that: (1) an ongoing attorney-client relationship existed between Sharp, McQueen and the Smiths under MRPC 1.7(a), creating a conflict of interest requiring disqualification and (2) the Smiths

disclosed to Sharp, McQueen confidential financial information that would be detrimental to the Smiths in settlement negotiations in the current controversy, creating a conflict of interest under MRPC 1.9(b)?

We reverse the district court. Sharp, McQueen is not disqualified.

## FACTS

An understanding of the disqualification claims, the counter arguments, and our resolution requires a detailed factual recitation.

A range fire in February 1996 near the Kansas/Oklahoma border burned approximately 25,000 acres, including 2,000 to 3,000 acres owned by the Smiths. Chris is the son of Bobbie. Loyd is Chris's uncle. The three are engaged in a family farming operation. On April 23, 1996, the Kansas landowners, including the Smiths and 34 others (3 more were added later), joined together as plaintiffs in a damage action filed against Tri-County in the district court of Meade County. The petition alleged that the fire was caused by sparks from an electrical distribution line negligently installed, operated, or maintained by Tri-County. Two law firms represented all plaintiffs: Morris, Laing, Evans, Brock & Kennedy, Chartered (Morris, Laing), of Wichita, and Cordes & Hess of Meade. A third firm, Lindner, Bolt & Marquez of Garden City, represented six of the plaintiffs, but not the Smiths. On May 17, 1996, Tri-County contacted Sharp, McQueen and requested that the firm handle its defense. Sharp, McQueen filed an appearance on May 20, 1996, and an answer on June 5, 1996. Discovery commenced.

Kerry McQueen, the Sharp, McQueen attorney handling Tri-County's defense, wrote to the Smiths' counsel on May 20, 1996, advising that Sharp, McQueen had in the past represented some of the Smiths in unrelated matters. McQueen requested that plaintiffs' counsel notify him if the Smiths believed a conflict existed. Morris, Laing advised McQueen on July 23, 1996, that Chris Smith was concerned about Sharp, McQueen continuing to represent Tri-County. Chris believed Sharp, McQueen had obtained sensitive confidential information concerning his farming operations and financial affairs. He thought the information could be used to his

detriment in the pending lawsuit. Chris claimed to have dealt with Sharp, McQueen as recently as April 1996. Morris, Laing requested that Sharp, McQueen withdraw as counsel for Tri-County.

McQueen advised that his firm did not feel there was any conflict of interest, but that he would forward the matter to his client for a decision. McQueen acknowledged that the firm's records showed a brief conference between Chris Smith and attorney Gene Sharp on April 19, 1996. According to Sharp, there were no disclosures relating to either the current lawsuit or other matters that would adversely affect the Smiths. Tri-County waived any conflict of interest.

On July 30, 1996, the Smiths filed a motion to disqualify Sharp, McQueen, alleging conflicts of interest under MRPC 1.7(a), 1.9(b) and 1.10(a) (1997 Kan. Ct. R. Annot. 305). The motion included a supporting affidavit of the Smiths describing the history of the attorney-client relationship with Sharp, McQueen beginning in 1990. The Smiths considered Sharp as the attorney for their business and expected to continue to do so.

Tri-County opposed the motion. Sharp filed a counter-affidavit, claiming that his representation of Chris and Bobbie Smith ended on April 5, 1996. He saw no conflict of interest.

Jerry Freck, an accountant for the Smiths, testified. Freck attended a meeting with Sharp and the Smiths in late 1994. According to Freck, the purpose of the meeting was to discuss the Smiths' financial situation and to make financial files available to Sharp. Sharp was representing the Smiths in a Meade County foreclosure action filed by Great Plains Federal Credit Union (Great Plains foreclosure). Freck brought financial information and projections regarding the Smiths' operation. Sharp selected certain documents for copying by his secretary. Freck did not know which documents were copied. Freck believed that the information was confidential.

Chris testified that Loyd and Bobbie first sought Sharp's assistance in early 1990 regarding a farm lease dispute. Chris recalled attending a meeting with Sharp, Bobbie, and Loyd. Sharp helped resolve the problem without litigation. Mike Dreiling, another attorney at Sharp, McQueen, prepared a title opinion for Loyd in early 1990. Chris produced two canceled checks drawn on Loyd's

account made out to Sharp, dated June 19, 1990, for $109.50 and May 17, 1991, for $60. One check was for the title opinion and the other was probably for the work on the lease dispute. Chris provided tax returns and financial statements to Tammie Kurth of Sharp, McQueen, who represented Chris and his wife in a 1993 adoption. In early 1995, Chris contacted Sharp regarding a lawsuit filed by Gigot Irrigation against Chris' corporation, Bar Diamond Ranch (Gigot Irrigation matter), concerning an unpaid bill. The collection suit was resolved in mid-1995. The Great Plains foreclosure matter, in which Sharp represented Chris, Bobbie, and the corporation, lasted through April 1996.

Chris recalled the 1994 meeting attended by Freck, Chris, Bobbie, Loyd, and Sharp. Sharp's involvement in representing Chris in the Great Plains foreclosure action was limited to obtaining extensions of time to respond. Sharp withdrew from the case in August 1995, and it was settled without Sharp's involvement. However, Sharp prepared documents for the land transaction that was part of the settlement. The proceeds from the transaction were to be applied to the Smiths' debt and closing costs. Included in the expenses paid by the sale proceeds were Sharp, McQueen legal bills, ($786 [the Great Plains foreclosure settlement, real estate transaction documents, review of the Jackson real estate contract, and an April 19, 1996, office visit], $66.65 [the Great Plains foreclosure action] and $329.97 [Gigot Irrigation matter]). Also included as attorney expenses paid out of the sale proceeds were bills from two other law firms—Cordes & Hess for $341.50 and Trippet & Kea for $300.

The last entry on the Sharp, McQueen bill showed a date of April 19, 1996, and .4 hours for services rendered by Sharp, with the following description:

"Office conference with Chris Smith on Northwest Fertilizer lawsuit; advised Chris to contact Northwest to see if they would be agreeable to obtaining their money through closing costs; he is to let us know if Northwest declines and we are to respond to petition."

Chris described the meeting with Sharp on April 19, 1996. Northwest Fertilizer had filed a collection action against Chris in

Beaver County, Oklahoma. Sharp and Chris had tried to call Northwest Fertilizer's attorney, but she was out of the office. Chris was to try to reach an agreement with the company for payment. If no agreement was reached, Chris was to advise Sharp and Sharp would respond to the petition. Although Chris did not contact Sharp again regarding that lawsuit and Northwest Fertilizer took a judgment against him, Chris considered the matter still open and pending. At the April 19 meeting, Chris also discussed a dispute with a banker and the advisability of filing a lawsuit. Although Chris did not ask Sharp to do anything further, Chris considered the matter open. Chris did not believe that either he or Sharp had ended the attorney-client relationship. However, Chris acknowledged that when he left Sharp's office on April 19, 1996, there was nothing further for Sharp to do unless Chris got back to him. Chris never mentioned anything to Sharp about the range fire, although he had been in contact with Sharp more than once after the fire.

Chris testified that around April 1, 1996, his father was going to enter into a contract concerning a sale of property with a lease back and option to buy. Sharp reviewed the contract and advised against signing unless some changes were made. The contract has not been signed.

A letter dated April 4, 1996, from Sharp to Chris and his father stated:

"Inasmuch as you all did not keep the appointment on March 22, 1996, with Rex Neubauer [another Sharp, McQueen attorney] relative to meeting the title requirements on the Powell Real Estate Sales contract and did not respond to my letter of February 9, 1996, relative to the Jackson Farm Lease and Option to Purchase agreement, I assume that you are not relying upon this office to take any further action with regard to either of these matters. If I am incorrect in my assumption, please let me know by return mail what it is you are looking for this office to do with regard to those matters."

A follow-up office memo prepared by Sharp's secretary dated April 5, 1996, regarding "Smith Real Estate Contracts/Lease" stated:

"Chris Smith called this morning in response to Gene's 4/4/96 letter.

"He stated that in regard to title opinions, Cordes had all the information needed by Attorney Gleeson; Gleeson told him on 4/1/96 that everything looked satisfactory but that he would know for certain 4/5/96.

"As for the Farm Lease, the Bank of Woodward is going to finance the land and they are not going to need a lease with Jackson.

"As [sic] this point he needs no further services of the office in this connection."

Chris confirmed that the financial information allegedly disclosed to Sharp was not related to the damages claimed in this range fire case, with the exception of settlement negotiations. Tri-County's counsel asked Chris how any confidential information disclosed to Sharp would, in Chris' opinion, operate unfairly in settling the range fire case. Chris said:

"I would say, if I knew that you were broke and I was going to trade a horse with you, sir, and you were wanting a hundred dollars for it and I knew that you really need 50 dollars, I would probably offer you 50 dollars and that would probably be what we would settle on, sir."

Tri-County's counsel then asked, and Chris answered, as follows:

Q. (By Mr. Strobel) ". . . You don't have to know anything about my personal income tax to make that statement, do you, in that analogy?
A. "Well, I would say that would just be good common sense.
Q. "But, I wouldn't have to disclose to you any confidential information about my business or anything for you to make that type of analogy, would you?
A. "Probably not."

Of the two 1990 checks drawn on Loyd Smith's account, Sharp acknowledged that the $109.50 check matched the billing of Mike Dreiling for the title opinion. Sharp did not know what the $60 check was for. Sharp did not believe Loyd Smith was in his office in the 1994 meeting that Freck and Chris testified about. Sharp denied that he had received copies of financial statements or tax returns from the Smiths in the 1994 meeting or at any time afterwards. The only documents he copied were the foreclosure pleadings. He denied being privy to any confidential or sensitive business information involving the Smiths.

As to the April 19, 1996, meeting with Chris Smith, Sharp testified that Chris was concerned that the Northwest Fertilizer lawsuit might prevent the Great Plains foreclosure settlement from closing. Chris also believed that the Northwest Fertilizer lawsuit was the result of a banker's violation of Chris' confidence. Chris discussed the information that he felt the banker had revealed. However, Sharp declined to represent Chris in suing the banker.

Sharp advised Chris to contact Northwest Fertilizer to determine if it would dismiss the lawsuit and accept payment from the sale proceeds of the foreclosure settlement. If that strategy did not work, Chris should contact Sharp to try something else. Chris never contacted Sharp again.

The parties agreed that there was no identity of issues between the range fire case and Sharp's representation of the Smiths.

## The District Court Rulings

The district court decided that Sharp, McQueen had obtained confidential information. This information possibly could be used to Chris' detriment in settlement negotiations in the range fire litigation. There was no clear termination of the attorney-client relationship, due to the short time between Sharp's last contact with Chris (April 19, 1996) and the date that Sharp, McQueen appeared in this lawsuit (May 20, 1996). Consequently Sharp, McQueen was disqualified, based on MRPC 1.7(a), 1.9(b), and 1.10(a).

Tri-County filed a motion requesting that (1) the order be amended to include findings necessary for an interlocutory appeal and (2) the proceedings be stayed pending appeal. The amendment for the interlocutory appeal language was granted. The stay application was denied.

The district court sua sponte severed the Smiths' claims from the claims of the other 37 plaintiffs. (Tri-County did not request severance; the Smiths vigorously opposed it.) Tri-County filed a motion to stay the severed claims of the Smiths, pending resolution of the interlocutory appeal. The motion was denied.

## The Severance Issue

The Smiths' counsel, during oral argument before us, advocated a total removal of Sharp, McQueen from the case. We do not reach the severance issue. The Smiths filed a notice of appeal of the district court's severance order. The Court of Appeals ordered the Smiths to show cause why their appeal should not be dismissed for lack of jurisdiction. There was no interlocutory appeal language in the order appealed from. None of the parties have filed a response

to the order to show cause. None of the issues arising from the Smiths' appeal of the severance order have been briefed.

As the case reaches us, Sharp, McQueen's status as current counsel for Tri-County in defending the other 37 plaintiffs is not at issue. Tri-County has retained other counsel to defend against the Smiths' claims. Our question is whether Sharp, McQueen should be disqualified from defending against the Smiths' claims.

## DISCUSSION

At the threshold of our discussion, we dispose of the applicability of MRPC 1.10(a), identify the standard of review, and note general comments from past attorney disqualification cases.

The district court found that Sharp, McQueen had violated MRPC 1.7(a) and 1.9(b). The MRPC serve as general standards of conduct and practice for the legal profession. See Rule 226 (1997 Kan. Ct. R. Annot. 262); *Chrispens v. Coastal Refining & Mktg., Inc.*, 257 Kan. 745, 749, 897 P.2d 104 (1995). For a concise discussion of the background of the MRPC, see *In re Estate of Koch,* 18 Kan. App. 2d 188, 212, 849 P.2d 977, *rev. denied* 253 Kan. 858 (1993).

Tri-County does not discuss MRPC 1.10(a), the imputed disqualification rule, apparently conceding that if a violation of MRPC 1.7(a) or 1.9(b) is found, the MRPC 1.10(a) violation follows. We agree. MRPC 1.10(a) provides: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8(c), 1.9, or 2.2." (1997 Kan. Ct. R. Annot. 305.) Under MRPC 1.10(a), the fact that Kerry McQueen had no client contact with the Smiths will not prevent a conflict of interest disqualification if other lawyers in the firm had sufficient client contact to cause a disqualification. Because MRPC 1.10(a) is not at issue, we move on without further discussion of the imputed disqualification rule.

We described our standard of review for an attorney disqualification case in *Chrispens,* 257 Kan. at 760-63. We decide whether the district court's findings of fact are (1) supported by substantial competent evidence and (2) sufficient to support the conclusions

of law. Our review of conclusions of law is unlimited. In *Chrispens,* we were reviewing the application of MPRC 1.9(a) and 1.10(b).

We said in *Lansing-Delaware Water District v. Oak Lane Park, Inc.,* 248 Kan. 563, 571, 808 P.2d 1369 (1991):

"A court deciding a motion to disqualify counsel must balance several competing considerations, including the privacy of the attorney-client relationship, the prerogative of a party to choose counsel, and the hardships that disqualification imposes on the parties and the entire judicial process. [Citation omitted.]"

We agree with the Court of Appeals' observation in *Lease-America Corp. v. Stewart,* 19 Kan. App. 2d 740, 750, 876 P.2d 184 (1994):

" 'Motions to disqualify "should be reviewed with extreme caution for they can be misused as a technique of harassment." ' [Citation omitted.] 'Such motions are often simply " 'common tools of the litigation process, . . . used . . . for purely strategic purposes.' " ' [Citation omitted.] 'The right to be represented by counsel of choice is an important one, subject to override only upon a showing of compelling circumstances.' [Citation omitted.]. . . . '[T]he purpose of the [MRPC] can be subverted when they are involved by opposing parties as procedural weapons.' Rule 226, Scope (1993 Kan. Ct. R. Annot. 256)."

Motions to disqualify are often disguised attempts to divest opposing parties of their counsel of choice. *Chrispens,* 257 Kan. at 772; see ABA/BNA Lawyers' Manual on Professional Conduct, p. 51:228 (1992).

### Burden of Proof—MRPC 1.7(a) Motion

This case presents our first occasion to discuss the burden of proof under an MRPC 1.7(a) disqualification motion. The Smiths would carry that burden in an MRPC 1.9(a) case. *Chrispens,* 257 Kan. at 756; see *LeaseAmerica Corp.,* 19 Kan. App. 2d at 750. We acknowledged in *Chrispens* that placing the burden of proof on the law firm sought to be disqualified under MRPC 1.10(b) is contrary to the general rule. 257 Kan. at 755. The Smiths do not rely on MRPC 1.10(b). In a motion to disqualify under MRPC 1.7(a), the general rule that the burden of proof is on the moving party applies. See ABA/BNA Lawyers' Manual on Professional Conduct, p. 51:228.

The Smiths assert that they are current clients of Sharp, McQueen. MRPC 1.7 concerns conflicts of interest involving adverse concurrent representation. See ABA/BNA Lawyer's Manual on Professional Conduct, p. 51:212. MRPC 1.7 (Conflict of Interest: General Rule) provides in part:

"(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

"(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

"(2) each client consents after consultation." 1997 Kan. Ct. R. Annot. 297.

The district court's MRPC 1.7(a) disqualification ruling was based on an existing attorney-client relationship between Sharp, McQueen and the Smiths at the time of the current litigation. "Whether a client-lawyer relationship exists for any specific purpose can depend on the circumstances and may be a question of fact." Rule 226, Scope (1997 Kan. Ct. R. Annot. 262, 265).

We have described the attorney-client relationship as

"not dependent on the payment of a fee, nor is a formal contract necessary to create this relationship. The contract may be implied from conduct of the parties. The employment is sufficiently established when it is shown that the advice and assistance of the attorney are sought and received in matters pertinent to his profession." *In re Adoption of Irons*, 235 Kan. 540, 548, 684 P.2d 332 (1984) (quoting 7 Am. Jur. 2d, Attorneys at Law § 118, pp. 187-88).

Tri-County argues that there is no substantial competent evidence supporting the conclusion that an ongoing attorney-client relationship existed at the time of the conflicting representation. Tri-County contends that Sharp, McQueen's representations of the Smiths involved specific matters. According to Sharp, McQueen, the general rule stated in the Comment to MRPC 1.3 (1997 Kan. Ct. R. Annot. 276) that the attorney-client relationship ends when the matter has been resolved, should apply.

The MRPC 1.3 Comment says:

"Unless the relationship is terminated as provided in Rule 1.16, a lawyer should carry through to conclusion all matters undertaken for a client. If a lawyer's employment is limited to a specific matter, the relationship terminates when the matter has been resolved. If a lawyer has served a client over a substantial period in a variety of matters, the client sometimes may assume that the lawyer will

continue to serve on a continuing basis unless the lawyer gives notice of withdrawal. Doubt about whether a client-lawyer relationship still exists should be clarified by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so." 1997 Kan. Ct. R. Annot. 276.

The Smiths, also relying on the MRPC 1.3 Comment, argue that the burden was on Sharp, McQueen to take some affirmative action to end the attorney-client relationship. According to the Smiths, any doubt about the existence of the attorney-client relationship should be resolved against termination. The Smiths emphasize that the April 19, 1996, meeting between Gene Sharp and Chris left open the possibility of a continuing attorney-client relationship. Sharp never wrote to them to end the relationship.

Although the Smiths consulted with various lawyers of Sharp, McQueen on different occasions between 1990 and 1996, the representations appear to involve isolated matters. The amount of legal work done by Sharp, McQueen for the Smiths over a 6-year period seems modest for a three-family farming operation. The work, as reflected by the record, was routine and transactional in nature (title opinion; review of farm lease; preparation of real estate sale contracts and deeds). The litigation work, as suggested by the billings, was also minimal (adoption proceeding; obtaining extensions of time in foreclosure action; settlement of irrigation company collection action). Sharp, McQueen was not the only law firm that the Smiths used.

The record supports termination of any attorney-client relationship for work before April 5, 1996 (Sharp's April 4, 1996, letter; his secretary's April 5, 1996, memo; and Chris Smith's testimony of his April 5, 1996, telephone conversation with Sharp's secretary). Sharp's work on the real estate contract documents was finished for some time. Chris was relying on another firm to resolve the title requirements. There were no other matters pending; consequently, we focus on April 19, 1996, the last contact between Sharp and Chris.

### The April 19, 1996, Office Visit

Chris' description of the meeting was more vague than Sharp's.

Both agreed at the end of the meeting that there was nothing pending for Sharp to do for the Smiths.

Sharp could have followed up the meeting with a letter clarifying his understanding of the situation, as he did in his April 4, 1996, letter. A written communication is recommended. See MRPC 1.3. However, after the meeting, Chris was not relying on Sharp to look after anything on the Smiths' behalf. Chris' failure to contact Sharp again regarding the Northwest Fertilizer lawsuit is inconsistent with any continuing attorney-client relationship, especially in view of the judgment taken against Chris in that case.

Frequently, an ongoing attorney-client relationship is evidenced by the client's payment of a retainer. The Smiths paid no retainer, nor was one requested by Sharp, McQueen. Chris characterized the Smiths' attorney client relationship with Sharp, McQueen as ongoing. We observe an anomaly in Chris' characterization, *i.e.*, the Smiths' failure to mention the range fire, a significant litigation event.

Even if we were to resolve any doubt created by the April 19 visit by finding an attorney-client relationship, disqualification would not be automatic. Federal cases have denied disqualification after acknowledging an MRPC 1.7(a) violation. Although finding an MRPC 1.7 violation, *SWS Financial Fund A v. Salomon Bros. Inc.*, 790 F. Supp. 1392 (N.D. Ill. 1992) (cited in *Koch v. Koch Industries*, 798 F. Supp. 1525, 1531 [D. Kan. 1992]), denied a disqualification motion, deciding that disqualification was not the proper remedy. In *Research Corp. Technologies v. Hewlett-Packard Co.*, 936 F. Supp. 697 (D. Ariz. 1996), a patent infringement case, a motion to disqualify was denied despite an MRPC 1.7(a) violation finding. We endorse the factors listed in *Research Corp. Technologies* for use in an MRPC 1.7(a) disqualification analysis.

"In determining whether disqualification is required, courts have examined various factors, including (1) the nature of the ethical violation, (2) the prejudice to the parties, including the extent of actual or potential delay in the proceedings, (3) the effectiveness of counsel in light of the violations, and (4) the public's perception of the profession. [Citation omitted.] In addition, whether or not a motion to disqualify has been used as a tactical device or a means of harassment should also be considered. [Citations omitted.]" 936 F. Supp. at 703.

But see *Kabi Pharmacia AB v. Alcon Surgical, Inc.*, 803 F. Supp. 957 (D. Del. 1992); and *Manoir-Electroalloys Corp. v. Amalloy Corp.*, 711 F. Supp. 188 (D.N.J. 1989), where disqualification was ordered.

Applying the *Research Corp. Technologies* factors here, we reason: (1) Any violation is characterized as inadvertent and not egregious. Sharp, McQueen is not representing Tri-County in pursuing a claim against the Smiths. The Smiths (along with 37 others) are pursuing claims against Tri-County. Sharp, McQueen notified the Smiths' counsel of the possible conflict by letter dated 3 days after being contacted to represent Tri-County. The Smiths had not requested legal services from Sharp, McQueen and were not relying on the firm to look out for their interests at the time Tri-County's answer was filed. (2) Tri-County may be more prejudiced if Sharp, McQueen is disqualified than the Smiths will be if disqualification is denied. Because the conflict only involves the Smiths, Tri-County will have the expense of adding another law firm to its defense team, even though Sharp, McQueen is defending against the claims of the other 37 landowners. Additional counsel will duplicate effort. (We note the Smiths assert that severance, which was the unexpected result of their disqualification efforts in the district court, "burdens plaintiffs and their counsel by requiring duplicative pretrial proceedings and two trials rather than one.") The Smiths exercised their right to choose counsel before filing suit. As we discuss later, any confidential information Sharp, McQueen may have received from the Smiths while representing them was unrelated to the present litigation. The Great Plains foreclosure and the Gigot Irrigation and Northwest Fertilizer collection actions exposed the Smiths' financial condition to public view. (3) Sharp, McQueen's effectiveness does not appear to be diminished by any MPRC 1.7(a) violations. Sharp, McQueen is not currently representing the Smiths in any pending matters. (4) The public's perception of the legal profession would not be diminished by Sharp, McQueen's representation of Tri-County. We emphasize the fact that Tri-County retained Sharp, McQueen to defend it against the Smiths' claims filed by other counsel. Any adverse pub-

lic perception is less likely than if Sharp, McQueen had represented a client suing the Smiths.

The Smiths' motion to disqualify was raised early in the litigation before any significant discovery had been conducted. Did the motion carry a purpose beyond an acceptable tactical motive? We neither reach a conclusion nor signal an inference on this query. We do observe that the Smiths' motion sought to disqualify Sharp, McQueen from representing Tri-County in the entire lawsuit—not just from defending the Smiths' claims. The asserted conflict issues pertained to the Smiths, who own only a small segment of the damaged property. None of the 37 other plaintiffs joined in the motion. The Smiths' counsel acknowledged that no conflict exists as to Sharp, McQueen and any other plaintiffs.

Loyalty is paramount in an attorney's relationship with a client. Generally, the loyalty thread holds the attorney from representation directly adverse to the client without the client's consent. The Smiths did not consent. Concurrent representation of clients with adverse interests is prima facie improper. However, we view MRPC disqualification motions with caution to guard against misuse.

We hold that the Smiths' client relationship with Sharp, McQueen had ended on all matters before April 19, 1996. We need not decide whether the April 19, 1996, conference between Chris and Sharp carried the attorney-client relationship forward to May 20, 1996, (the date Sharp, McQueen filed an entry of appearance as counsel for Tri-County). Under the facts here, even if we were to find an MRPC 1.7(a) violation, we reverse the disqualification.

## MRPC 1.9(b) (Conflict of Interest: Former Clients)

We now consider the second disqualification issue. The district court found: (1) The Smiths disclosed to Sharp, McQueen confidential financial information during the attorney-client relationship; (2) the information would be detrimental to the Smiths in settlement negotiations in the current controversy; and (3) a MRPC 1.9(b) conflict of interest exists, disqualifying Sharp, McQueen from representing Tri-County against the Smiths' claims.

MRPC 1.9, characterized as a serial representation rule, see 1 Hazard and Hodes, The Law of Lawyering § 1.9:101 (1996 Supp.), provides:

> "A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> "(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
>
> "(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known." 1997 Kan. Ct. R. Annot. 304.

MRPC 1.9 does not prohibit adverse serial representation per se, but imposes certain restrictions.

The Comment to MRPC 1.9 provides in part:

> "Information acquired by the lawyer in the course of representing a client may not subsequently be used by the lawyer to the disadvantage of the client. However, the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client." 1997 Kan. Ct. R. Annot. 304.

A client is entitled to have confidences and secrets protected. *Lansing-Delaware Water District*, 248 Kan. at 574.

MRPC 1.9(a) hinges on the establishment of a substantial relationship between current and former matters. We discussed various versions of the substantial relationship test applied under MRPC 1.9(a) in *Chrispens*, 257 Kan. at 751-54 (declining to adopt any particular test and preferring a case-by-case determination).

The Smiths acknowledge that they did not seek disqualification of Sharp, McQueen under MPRC 1.9(a). Thus, they contend that the substantial relationship test is not relevant. They concede that the subject matters of the current litigation and Sharp, McQueen's past representations are not substantially related. They contend that MRPC 1.9 proscribes alternate types of adverse serial representation. One type is under 1.9(a) involving a substantial relationship between the current and former matters, and the other is under 1.9(b) involving use in the current representation of confidential information to the former client's disadvantage. The Smiths further argue that MRPC 1.9(a) and (b) should be read disjunctively.

As support for their disjunctive interpretation, the Smiths cite *In re American Airlines, Inc.*, 972 F.2d 605, *reh. denied* 976 F.2d 732 (5th Cir. 1992), *cert. denied* 507 U.S. 912 (1993) (defendant airline's former counsel was disqualified from representing plaintiff airline; prior representations involved substantially related matters), in which the court observed: "While the focus of our cases has been on the substantial relationship test, we have indicated that a former client could also disqualify counsel by showing that his former attorney possessed *relevant confidential information* in the manner contemplated by Rule 1.09(a)(2) [similar to our MRPC 1.9(b)]." (Emphasis added.) 972 F.2d at 615.

We agree that the confidential information must be relevant. An MRPC 1.9(b) motion to disqualify requires proof that (1) the attorney sought to be disqualified has acquired confidential information during the former attorney-client relationship and (2) the confidential information could be used to the disadvantage of the former client in the current matter. There is no irrebuttable presumption that the attorney acquired such information, absent a substantial relationship between the current and former matters.

There are similarities between the elements of an MRPC 1.9(b) motion to disqualify, the type at issue here, and an MRPC 1.10(b) motion. Although an MRPC 1.10(b) motion requires that the current and former matters be the same or substantially related, while an MRPC 1.9(b) motion does not, both require a showing that confidential information was disclosed during the prior attorney-client relationship. MRPC 1.10(b) requires that the confidential information be material to the current matter. In order for confidential information to be used to the disadvantage of the former client under MRPC 1.9(b), such information must be sufficiently relevant to the current matter to cause disadvantage. The MRPC 1.9(b) relevancy requirement is similar to the materiality requirement of MRPC 1.10(b).

In an MRPC 1.9(b) motion to disqualify, an evidentiary hearing is required on the question of whether relevant confidential information was acquired during the former representation. The type of factual inquiry is similar to an MRPC 1.10(b) motion to disqualify evidentiary hearing. The factual inquiry will necessarily in-

volve disclosure of the alleged confidential information. Tools such as conducting a portion of the hearing out of the presence of the party against whom confidentiality is to be protected or an in camera inspection are available to the district court to prevent disclosure of the information to adverse parties and counsel.

## Burden of Proof—MRPC 1.9(b) Motion

Although *Parker v. Volkswagenwerk Aktiengesellschaft*, 245 Kan. 580, 781 P.2d 1099 (1989), places the burden of proof on the firm sought to be disqualified in an MRPC 1.10(b) motion, the burden of proof does not belong on the attorney or firm to be disqualified in an MRPC 1.9(b) motion. Because MRPC 1.10(b) involves substantially related current and former matters, imposing the burden of proof on the attorney or firm sought to be disqualified is appropriate. Adverse serial representation is not generally prohibited absent a substantial relationship between the current and former matters; thus, the burden of proof is on the party seeking disqualification in an MRPC 1.9(b) motion. See ABA/BNA Lawyers' Manual on Professional Conduct, p. 51:228. In *Chrispens*, 257 Kan. at 755, we relied on the Comment to MRPC 1.10(b) and (c) in holding that the burden of proof should rest upon the firm whose disqualification is sought. The Comment to MRPC 1.9 does not mention the burden of proof. Here, the Smiths carry that burden.

## MRPC 1.9(b) Cases

The Smiths offer *In re Habeas Corpus Petition of Hoang*, 245 Kan. 560, 781 P.2d 731 (1989), *cert. denied* 494 U.S. 1070 (1990), as support for disqualification here. *Hoang* involved a conflict under MRPC 1.9 and 1.10, in which we made no mention of the substantial relationship test. In *Hoang*, we decided that the district court's disqualification of defense counsel for a conflict of interest in a murder case was not an abuse of discretion. 245 Kan. at 566. On the eve of trial, Hoang's attorney, a public defender, disclosed that another attorney from the same office had defended Tran, a key prosecution witness. The district court decided that Hoang's attorney would face a conflict of interest in attempting to cross-

examine Tran, having imputed knowledge of confidential communications from Tran. Our opinion does not say whether the conflict determination was based on MRPC 1.9(a) or (b). Confidential communications received from Tran during his defense preparation involving the same incident that Hoang was later tried for clearly could relate to Hoang's case. *Hoang* is an abuse of discretion case. Reliance on *Hoang* solely as an MRPC 1.9(b) case is misplaced.

Although factually distinguishable, *Graham by Graham v. Wyeth Laboratories*, 760 F. Supp. 1451 (D. Kan. 1991) is an MRPC 1.9(b), 1.10(b) case. Wyeth, the defendant vaccine manufacturer, sought to disqualify plaintiff's counsel, Michaud & Hutton, because Randall Fisher had recently joined the Michaud firm. Fisher had formerly been employed by Wyeth's counsel, McDonald, Tinker, Skaer, Quinn & Herington (McDonald, Tinker) at a time when McDonald, Tinker was defending Wyeth in the *Graham* case. Wyeth sought disqualification of both Fisher and the firm. (Under MRPC 1.10[b], imputed disqualification of the new firm only applies if it is shown that at the former firm, the attorney "acquired information protected by Rules 1.6 and 1.9[b] that is material to the matter." 1997 Kan. Ct. R. Annot. 305, 306.) After a *Parker* evidentiary hearing, the court denied the motion, concluding: "Fisher was never exposed to any material or confidential information . . . which pertained to Wyeth's DTP process or defenses." 760 F. Supp. at 1457. The court was frustrated by Wyeth's attempt to claim attorney-client privilege as to the alleged confidential communications between Wyeth and Fisher. The court felt it was placed in the position of attempting to decide whether material confidential information had been disclosed without disclosure to the court of the actual information. The court decided that Wyeth had waived any such privilege because the "material and confidential information allegedly revealed in the course of those dealings is the very subject matter of this dispute." 760 F. Supp. at 1456. See *Indus. Parts Distributors, Inc. v. Fram Corp.*, 504 F. Supp. 1194 (D. Kan. 1981) (although a pre-MRPC case based on Canons 4 ["A lawyer should preserve the confidences and secrets of a client."] and 9 ["A lawyer should avoid even the appearance

of impropriety."], it involved an MRPC 1.9(b)-type fact situation in which disqualification was denied).

Courts in adverse serial representation cases from other jurisdictions have denied motions to disqualify counsel when no substantial relationship was found between the former and current matters and no relevant confidential information was disclosed in the former representation. See, *e.g., Bartech Indus. v. International Baking Co.,* 910 F. Supp. 388 (E.D. Tenn. 1996); *Brice v. Hess Oil Virgin Islands Corp.,* 769 F. Supp. 193 (D.V.I. 1990); *Ex Parte Taylor Coal Co., Inc.,* 401 So. 2d 1 (Ala. 1981); *Niagara Mohawk Power v. Town of Tonawanda,* 236 App. Div. 2d 783, 654 N.Y.S.2d 77 (1997); and *Bank of Tokyo Trust v. Urban Food Malls,* 229 App. Div. 2d 14, 650 N.Y.S.2d 654, 655 (1996).

## Information Disclosed By the Smiths

What did the Smiths disclose to Sharp, McQueen that would justify disqualification? The former and current matters here are unrelated. We must decide whether any confidential information the Smiths revealed to Sharp, McQueen could be used to the Smiths' disadvantage.

The Smiths contend that during an October 1994 meeting with Sharp and their accountant, Freck, concerning the Great Plains foreclosure, they revealed confidential financial information. The record does not suggest that Sharp was ever asked to produce any financial documents of the Smiths that he may have copied.

The district court asked Sharp whether, in preparing the Great Plains foreclosure settlement documents, he had knowledge of the terms of the April 1996 closing. Sharp acknowledged that he did. Sharp also acknowledged knowing how the sale proceeds were to be disbursed, at least as to those relating to liens against the real estate. Sharp stated that he did not know how much of the sale proceeds the Smiths would receive, if any. The judge also asked Sharp about the April 19, 1996, conference with Chris and Chris' discussion of a banker's alleged violation of confidence. Sharp acknowledged that he was told about what Chris thought was a confidence violation by the banker. However, Sharp disagreed that the

confidence was sensitive information and offered to explain, but he was not allowed to.

The district court based disqualification under MRPC 1.9(b) on the fact that "critical and sensitive information concerning the financial circumstances of Mr. Smith" was available to Sharp, and "the possibility of its use might result in a detrimental result for Mr. Smith in any subsequent negotiations or settlement that might occur as a result of the claim filed in the current litigation." The district judge believed that Chris' horse trade reference was a good analogy. The district court did not decide specifically what the sensitive information was or how it could be used to the disadvantage of the Smiths, beyond reference to the horse trade.

If Sharp, McQueen had been representing Tri-County as a creditor pursuing a collection claim against the Smiths, the "horse trade" reference would have more appeal. The status of the Smiths' assets and liabilities would be relevant in a collection matter. Here, the Smiths are suing Tri-County for damages arising from a range fire. The Smiths' financial condition is not relevant to the value of the fire damage claims. The Smiths' claims put in issue discoverable information, i.e, the income-producing capacity of the fire-damaged range land.

Financial information the Smiths provided to Sharp, McQueen would not be current. The adoption proceeding was at least 3 years old at the time this case was filed. Information provided in the October 1994 meeting concerning the Great Plains foreclosure was almost 2 years old. In view of the foreclosure and collection actions, the Smiths' general financial condition was public knowledge. We conclude, from the record here, that Sharp, McQueen is not disqualified under MRPC 1.9(b).

## Rule Interpretation Applied by District Court

The district court appears to have applied the irrebuttable presumption of a detrimental confidential disclosure. The presumption is used in MRPC 1.9(a) cases when a substantial relationship between the current and former matters has been established. Leading up to his ruling, the district judge stated:

"I believe that the thing must be approached not by examining the specific information that may have been disclosed, but must be examined in light of the circumstances surrounding the disclosure and whether or not those circumstances serve a foundation for finding that it was a confidential and privileged communication.

". . . The Court does not need to examine whether or not there's a probability that this will result in a detrimental or damaging disclosure. I think it must look at only if there's a possibility that it could result in that."

The judge was not sure that "it's really important whether or not Mr. Sharp recalls the details of that information." The district judge was confronted with a difficult judgment call. However, it is impossible to weigh relevance and decide if the information could be used to the former client's disadvantage, without knowing what the information was. The district court moved from finding that the Smiths had disclosed sensitive financial information to the conclusion that because of those disclosures, "there is certainly the possibility that that information if used, . . . might result in a detrimental result for Mr. Smith in any subsequent negotiations or settlement that might occur as a result of the claim filed in the current litigation."

When matters are not substantially related, there is no presumption that detrimental confidential information was disclosed during the former representation. During Chris' cross-examination, Tri-County's counsel attempted to probe more specifically into how the alleged information disclosure could be harmful to the Smiths now: "Is it simply that Mr. Sharp, because of this information, may know that you are having some financial problems and that might result in some undue advantage?"

The Smiths' counsel objected because the answer might disclose the alleged sensitive financial information. The district court sustained the objection. Although Chris later answered this line of questioning with his horse trade analogy, Sharp, McQueen's counsel was prevented from asking about the specific contents of the alleged sensitive information. Tri-County's counsel asked rhetorically, "But how can the court make [a] determination if there's that type of information without knowing what the information is?" The Smiths' counsel responded that disclosure of the information

"would be direct opposition to the reason that we're here, to preserve the attorney-client relationship." The court was faced with determining whether Chris had revealed relevant confidential information to Sharp at the April 19, 1996, visit without knowing specifically what the alleged information was. The district court appears to have assumed that information was detrimental to the Smiths, despite Sharp's contention that he could explain why it was not.

The Smiths' counsel, although making clear that the motion to disqualify was brought under MRPC 1.7(a), 1.9(b), and 1.10(a), suggested *Koch v. Koch Industries*, 798 F. Supp. 1525 (D. Kan. 1992), as guidance for resolving the degree of inquiry into the contents of alleged confidential disclosures. However, *Koch* involved establishment of a substantial relationship under MRPC 1.9(a) between former and current matters. The irrebuttable presumption that the attorney or firm to be disqualified acquired detrimental confidential information during the former attorney-client relationship came into play. There was no need for the *Koch* court to decide what the confidential disclosures were because they were presumed to have occurred. MRPC 1.9(b) does not mention the existence of a substantial relationship, and no presumption applies. The district court's reliance on *Koch* and the MRPC 1.9(a) irrebuttable presumption was misplaced.

For the purposes of their motion to disqualify, the Smiths waived any attorney-client privilege as to contents of confidential information they claim Sharp, McQueen acquired. Otherwise, the court must decide whether the alleged information could be used to the disadvantage of the Smiths, without ever knowing what the information was. See *Graham*, 760 F. Supp. at 1456. The Smiths did not seek either a hearing out of the presence of the party against whom confidentiality is to be protected or in camera inspection here. (We note that Sharp, McQueen submitted under seal a copy of its engagement letter to the Smiths concerning the Great Plains foreclosure action to emphasize that its involvement was limited only to obtaining extensions of time.) See *Pacific Emp. Ins. v. P.B. Hoidale Co., Inc.*, 789 F. Supp. 1112, 1117 (D. Kan. 1992) ("In an effort to give Employers [the party seeking disqualification] every

benefit of the doubt, the court offered Employers the opportunity for in camera review of any information that it considered material and confidential"; MRPC 1.10[b] motion to disqualify denied.)

Chris acknowledged during cross-examination that financial records disclosed to Sharp would have nothing to do with the number of acres of grass burned in the fire, the value of that grass, and the value of fences or other personal property lost. The Smiths claim that the financial information could be used against them in settlement negotiations—although nothing specific was shown. The district court could only speculate what the alleged confidential information was and how it disadvantaged the Smiths. The Smiths joined 37 other landowners in suing Tri-County. The likelihood that the Smiths' financial condition will have any detrimental effect on the settlement strategy for their claims seems more imagined than real; consequently, we see no need to remand for a new evidentiary hearing.

We reverse the district court and remand for an entry of judgment denying the motion to disqualify.

ABBOTT, J., not participating.

E. NEWTON VICKERS, Senior Judge, assigned.