No. 80,786

ASSOCIATED WHOLESALE GROCERS, INC., *et al., Appellees,* v. AMERICOLD CORPORATION, *et al., Defendants,* and NORTHWESTERN PACIFIC INDEMNITY COMPANY, *Appellant.*

(975 P.2d 231)

Opinion filed March 5, 1999.

*Stephen A. Cozen,* of Cozen and O'Connor, of Philadelphia, Pennsylvania, argued the cause, and *David R. Strawbridge, Thomas G. Wilkinson, Jr.,* and *Gaele Mclaughlin Barthold,* of the same firm, and *M. Warren McCamish,* of Williamson & Cubbison, of Kansas City, Kansas; and *James D. Oliver* and *Robert L. Howard,* of Foulston & Siefkin, L.L.P., of Topeka, were with him on the briefs for appellant.

*John M. Duggan,* of Duggan, Shadwick & Doerr, of Kansas City, Missouri, argued the cause, and *Jay T. Shadwick,* of the same firm; *Jo Ann Butaud,* of Evans & Mullinix, P.A., of Lenexa; *John E. North, Jr.,* and *Pamela K. Black,* of McGrath, North, Mullin & Kratz, P.C., of Omaha, Nebraska; *Edward J. Barbosa, William J. Gotfredson,* and *Edward L. Smith,* of Knipmeyer, McCann, Smith, Manz & Gotfredson, of Kansas City, Missouri; and *James A. Durbin* and *Richard N. Bien,* of Swanson, Midgley, Gangwere, Kitchin & McLarney, L.C., of Kansas City, Missouri, were with him on the brief for appellees.

The opinion of the court was delivered by

SIX, J.: This is an attorney disqualification case under MRPC 1.9, Conflict of Interest: Former Client (1998 Kan. Ct. R. Annot. 320), and MRPC 1.10, Imputed Disqualification (1998 Kan. Ct. R. Annot. 322). Northwestern Pacific Indemnity Company (NPIC) appeals the disqualification of its trial counsel Cozen and O'Connor of Philadelphia. The district court found an implied attorney-client

relationship between a member of that firm and one or more of the plaintiffs here. (NPIC's Kansas counsel was not disqualified.)

Our jurisdiction is under K.S.A. 20-3017 (a motion by a party to transfer).

The question is: Did the district court err in its disqualification decision?

The answer is, "Yes."

## FACTS

Our background journey requires a brief return to *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 934 P.2d 65 (1997) (*Americold I*). *Americold I* involved lawsuits arising out of a fire in Americold's 170 acre underground cold storage facility. Americold had primary general liability coverage for tenant claims of $1 million through National Union Fire Insurance Company (National Union), with $25 million excess coverage through NPIC. TIG Insurance Company (TIG) provided $15 million excess coverage to National Union and NPIC. National Union eventually tendered the $1 million policy limit to plaintiffs, who were various tenants and their subrogated insurers, referenced here as Associated Wholesale Grocers, Inc., *et al.* (Associated).

Although the fire burned only a part of the stored goods, smoke and other contaminants discharged by the fire damaged other goods stored in the facility. NPIC disclaimed coverage, reasoning that the claimed damages were excluded by the policy's pollution exclusion.

Concluding that NPIC and TIG were denying coverage, Americold negotiated a settlement with Associated. The settlement included consent judgments totalling $58,670,754, a covenant by Associated not to execute against the assets of Americold, and an assignment of Americold's claims against its excess insurers, NPIC and TIG. After the settlement, Associated filed a garnishment action against NPIC. The district court granted summary judgment in favor of Associated. We reversed. TIG settled while *Americold I* was on appeal. Material issues of fact remained "as to the good faith and reasonableness of the settlement amount resulting in the consent judgments, the excess insurer's bad faith in denial of cov-

erage and rejection of settlement within the policy limits, and the liability of the excess insurer for the judgments over policy limits." 261 Kan. 806, Syl. ¶ 15. We held, however, that the pollution exclusion in the NPIC policy did not exclude coverage. 261 Kan. at 811.

## Disqualification on Remand

On remand from *Americold I*, NPIC retained the Cozen and O'Connor firm as counsel. According to NPIC, new counsel was engaged because there was a substantial likelihood that prior counsel would be called as witnesses to answer allegations of insurer bad faith. Associated sought to disqualify Cozen and O'Connor, alleging a member of the firm (Daniel Q. Harrington) had an implied attorney-client relationship with Associated.

Cozen and O'Connor, although not involved in *Americold I*, represented two subrogated insurers in federal court with bailment claims against Americold. Associated's *Americold I* claims were in state court. Harrington did not name NPIC in his client's suit against Americold. He settled the bailment claims in 1994, separately from the Associated tenant claims settlement at issue in *Americold I*. (Before oral argument in *Americold I*, NPIC and two of the Associated plaintiffs, Arkwright and Doskocil, filed a joint motion requesting remand to allow the district court to vacate judgments totaling $26,887,191. The remaining Associated plaintiffs objected. We granted the motion. The Arkwright and Doskocil judgments against NPIC were vacated. 261 Kan. at 820.

In early 1993, Associated's tenant claims in state court and the federal cases were consolidated for discovery. Harrington and other plaintiffs' attorneys entered into a February 16, 1993, Agreement Regarding Exchange of Information (the Agreement). The Agreement provided that the listed parties

"have a joint interest in pursuing litigation against Americold Corporation and Americold Services Corporation (Americold Defendants), arising out of the fire that occurred on December 28, 1991, at the Americold Storage Facility in Kansas City, Kansas;

"WHEREAS, exchange of information obtained or developed by the parties will further the parties joint interest in pursuing their claims against the Americold Defendants.

"Now, therefore, the parties identified in this Agreement through their respective, undersigned attorneys, agree:
1. All information exchanged regarding the fire will be exchanged pursuant to the joint interest of the parties; and
2. By exchanging information the parties do not intend to waive and are not waiving any work product protection, attorney-client privilege or other protection or privilege applicable to information obtained or developed by any party; and
3. This agreement does not require any party to exchange information.
Dated: February 16, 1993."

(The signatures of Harrington and several counsel for Associated in this case followed.)

## The Parties' Claims

According to Associated, Harrington also shared trial strategy, legal research, and draft briefs of arguments opposing Americold's motion for summary judgment, and participated in conference calls and meetings. In support of these allegations, Associated submitted affidavits from three attorneys, John Duggan, William Gotfredson, and Edward Barbosa. In a lengthy affidavit, Harrington refutes Associated's contentions concerning his representation. Specifically, he denies ever receiving confidential information or entering into a joint representation agreement with other plaintiffs. Harrington contends that the Agreement was not a "joint representation agreement," but an agreement stating any shared information would remain subject to any applicable attorney-client privilege. According to Harrington, he never received any confidential information. Harrington also draws a distinction between his clients and Associated. Harrington observes his clients sought recovery under Americold's warehouseman's legal liability line of coverage (provided by Home Insurance Company). Associated's claims were asserted under Americold's general liability line of coverage (National Union and NPIC).

Associated admits that neither Harrington nor Cozen and O'Connor were retained to represent any of the Associated plaintiffs. Associated argues, however, that Harrington represented other plaintiffs against Americold "and by agreement shared confidential information of the Plaintiffs." The parties advanced opin-

ions from four prominent attorneys in the legal ethics field. Associated submitted an affidavit from J. Nick Badgerow, Chairman of the Wyandotte County Bar Association Ethics and Grievance Committee and co-author, co-editor of the Kansas Ethics Handbook (Kan. Bar Assoc. 1996). Badgerow opined that Cozen and O'Connor had a conflict of interest precluding representation of NPIC based on MRPC 1.6, confidentiality of information (1998 Kan. Ct. R. Annot. 309), and MRPC 1.9. conflict of interest: former client (1998 Kan. Ct. R. Annot. 320). Badgerow reasoned that by the terms of a joint representation agreement: (1) "confidential information was shared among the various plaintiffs" and (2) "a fiduciary duty on the part of each participation (plaintiff and counsel) not to use or disclose any confidential information received from any other party" was created.

NPIC submitted affidavits from: Michael A. Barbara, former Shawnee County District Judge and Professor Emeritus, Washburn University School of Law; Samuel Dash, Professor of Law, Georgetown University, former special counsel to the Watergate Committee, retained by the Independent Counsel appointed to investigate the Whitewater matter as ethics counsel; and Geoffrey C. Hazard, Jr., Trustee Professor of Law, University of Pennsylvania, Sterling Professor of Law Emeritus at Yale University and executive director of the American Law Institute.

Professor Barbara concluded Cozen and O'Connor had no disabling conflict of interest and that there was no basis for disqualification. In Professor Dash's opinion, no ethical or legal rule justifies the disqualification of Harrington or Cozen and O'Connor. Professor Dash reviewed the Agreement and, with the exception of the two in camera exhibits, the other Associated submissions in support of disqualification. In Professor Hazard's opinion, neither Harrington nor Cozen and O'Connor "have any disabling conflict of interest, fiduciary duty or confidentiality obligation to the plaintiffs in the garnishment proceeding that would or should serve to disqualify them from continuing to represent NPIC." Professor Hazard also reviewed the Agreement, concluding: "[H]ere, there was a brief agreement for cooperation dated February 16, 1993. Significantly, that agreement has *no* provision concerning confi-

dentiality. Accordingly, there was no contract expectation created among the parties to the agreement for cooperation and, hence, no basis to apply the common law concept of 'implied attorney-client relationship.' "

## The District Court's Ruling

The district court found: (1) The underlying litigation in which Harrington participated was substantially related to the garnishment action against NPIC, and (2) the Agreement was clear evidence of an intent by the signatories to maintain confidentiality of all aspects of the underlying litigation. The district court considered the four expert's affidavits and found the Badgerow opinion "more well-reasoned and more relevant to the issues presented." Adopting the reasoning of *GTE North, Inc. v. Apache Products Co.*, 914 F. Supp. 1575 (N.D. Ill. 1996), as applicable to this case, the district court disqualified Cozen and O'Connor. We return to *GTE North* later in the opinion.

## DISCUSSION

Associated moved to disqualify the firm of Cozen and O'Connor under MRPC 1.9 and 1.10. In reviewing an attorney disqualification order, we decide whether the district court's findings of fact are (1) supported by substantial competent evidence and (2) sufficient to support the conclusions of law. Review of questions of law is unlimited. *Barragree v. Tri-County Electric Co-op, Inc.*, 263 Kan. 446, 454-55, 950 P.2d 1351 (1997).

Judge Spencer A. Gard has described the attorney-client relationship:

"In the professional relationship between lawyer and client two principles are deeply ingrained in the ethical scheme. One is that communications which pass between them in professional confidence must be insulated from being revealed, even in court, except with the consent of the client. The other is that the legal talent which the client has hired and for which he is expected to pay belongs to him, and that neither he nor his lawyer may be compelled to permit the adversary to capitalize upon it. The first principle is for the protection of the client alone and is known as the lawyer-client privilege, long recognized at common law. The second principle is for the benefit of both the client and the lawyer and may be loosely described as that of proprietorship in the 'work product.' " Gard, *Discovery*

*as Affected by the Attorney-Client Privilege and the Work Product Rule Under the New Code*, 33 J.K.B.A. 7 (Spring 1964).

MRPC 1.9 provides:

"A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known."

MRPC 1.10 is the imputed disqualification rule. If Harrington had an attorney-client relationship with Associated in a substantially related matter, the Cozen and O'Connor firm is disqualified if Harrington is disqualified. MRPC 1.9 and 1.10 apply only when a former client is at issue. Thus, an attorney-client relationship must be established before an MRPC 1.9 or 1.10 violation exists. Associated does not argue that an express attorney-client relationship existed here. Rather, Associated relies upon the district court's finding that Harrington's implied attorney-client relationship with Associated arose from the Agreement.

### Implied Attorney-Client Relationships

We have not addressed the issue of an implied attorney-client relationship under a claimed joint representation agreement. We have, however, acknowledged the general rule on implied attorney-client relationships:

" 'The authority of an attorney begins with his retainer; but the relation of attorney and client is not dependent on the payment of a fee, nor is a formal contract necessary to create this relationship. The contract may be implied from conduct of the parties. The employment is sufficiently established when it is shown that the advice and assistance of the attorney are sought and received in matters pertinent to his profession.' " *In re Adoption of Irons*, 235 Kan. 540, 548, 684 P.2d 332 (1984) (quoting 7 Am. Jur. 2d, Attorneys at Law § 118).

*Professional Service Industries, Inc. v. Kimbrell*, 758 F. Supp. 676, 682 (D. Kan. 1991), observed that Kansas recognizes an implied attorney-client relationship only where the client sought and received personal legal advice from the attorney.

Associated does not claim to have ever sought or received legal advice from Harrington. The contention is that Harrington executed the Agreement, which provided: (1) The signers "have a joint interest in pursuing litigation against Americold Corporation" and (2) an "exchange of information obtained or developed . . . will further the parties [*sic*] joint interest in pursuing their claims." Associated also relies on the language of the Agreement that says "all information exchanged regarding the fire will be exchanged pursuant to the joint interest of the parties." Associated asserts that Harrington received confidential information and his receipt of that information produced an implied attorney-client relationship.

Although a joint representation agreement was not involved, a similar claim was asserted in *Kimbrell*, 758 F. Supp. at 681. Kimbrell was president and former owner of a corporation subject to formal complaints filed by the Environmental Protection Agency (EPA). When the corporation later sued Kimbrell, he argued two lawyers attending a corporate meeting where he presented information about EPA complaints should be disqualified. The lawyers represented the corporation and never expressly agreed to represent Kimbrell. Kimbrell reasoned, however, that the presence of the lawyers at a meeting in which he disclosed "confidential information" gave rise to an implied attorney-client relationship between himself and the lawyers.

Kimbrell argued that other jurisdictions have implied an attorney-client relationship without a formal agreement when the purported client " 'has some interest of his own in common with others and is seeking to advance a common position.' " 758 F. Supp. at 682. Judge Crow did not agree with Kimbrell's expansive reading. Judge Crow noted that the cases focused on whether the party divulging information had the intent to secure legal advice. 758 F. Supp. at 682 (citing *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1320 [7th Cir. 1978]). Because Kimbrell had no such intent at the formal group meeting, and there was no pretense that the attorneys represented anyone but the corporation, no implied attorney-client relationship existed. 758 F. Supp. at 682-83.

Under *Kimbrell's* facts, the case correctly states the Kansas rule. Applying the rationale of *Kimbrell*, Associated cannot show an implied attorney-client relationship. The district court below did not address *Kimbrell*, but relied on *GTE North*, 914 F. Supp. 1575, in determining Cozen and O'Connor should be disqualified.

Because the district court and Associated key Cozen and O'Connor's disqualification to *GTE North*, we next focus on the facts in that case and the facts here. In *GTE North*, various companies received notification from the EPA that they were a "Potentially Responsible Party" (PRP) in the clean-up of a Superfund landfill site. Five of the companies, including GTE and Chrysler, formed a committee and executed a joint, remedial cost-sharing agreement (the Appleton Agreement) concerning the potential litigation. The Appleton Agreement's purpose was to allocate costs, cooperate in investigating and identifying other PRP's, and jointly pursue cost recovery activities against any other PRP's. The Appleton Agreement also included strict confidentiality provisions which provided that all shared information between members and their counsel shall " *'be held in strict confidence by the receiving member and by all persons to whom such confidential information is revealed by the receiving member.'* " (Emphasis added.) 914 F. Supp. at 1577. Chrysler was represented by Faletto.

Chrysler and GTE and others who wished to pursue cost recovery entered a second agreement, the "Investigation Agreement." The Investigation Agreement contained several confidentiality provisions. Under the Investigation Agreement, "confidential communications" were disseminated to all members. After the investigation, Chrysler decided not to litigate and assigned its rights to the committee. GTE then sued Dean Foods. When Faletto appeared as counsel for Dean Foods, GTE sought to disqualify him, and his firm, based on imputed disqualification. GTE argued Faletto received "confidential communications," attended strategy sessions, and shared the investigation results, including the relative legal merit of proceeding against certain PRP's, including Dean Foods. Faletto and his firm were disqualified. Because *GTE* was a civil case, the court required a showing that an exchange of confidential information had actually taken place. The existence of a

confidentiality agreement was insufficient to meet this burden. The court held that there must actually have been an exchange of confidential information. 914 F. Supp. at 1580.

Faletto did not contest crucial facts submitted by GTE concerning his receipt of confidential information. The *GTE North* court pointed out that Faletto discussed investigation results, strategy, and the legal merit of proceeding against other parties, namely, Dean Foods. Faletto was privy to material confidential information regarding GTE's case against Dean Foods. Faletto did not contest the fact that the matters were the same or substantially related; thus, the *GTE North* court did not have to make that finding.

The district court here did not state what aspects of the *GTE North* rationale it found convincing. No finding that Harrington actually received confidential information was made. It is unclear what, if any, confidential information the court thought Harrington received. The parties vigorously dispute whether confidential information was conveyed to Harrington.

At the conclusion of argument in the district court on the motion to disqualify Cozen and O'Connor, John M. Duggan, on behalf of Associated, submitted two exhibits ("Attorney Notes from conference calls" and "Memorandum and notes from February 16, 1993 meeting") for in camera inspection. Stephen A. Cozen, in opposing the motion, submitted "Documents referenced in John Duggan's affidavit." The district court said: "[I]n the event that I rely to any degree upon any of those three exhibits, I will so note in the opinion that I write determining this motion." No reference is made to either any in camera submission or to confidential information shared by Harrington in the district court's disqualification rulings.

The factual differences between this case and *GTE North* are remarkable. We do not read *GTE North* as persuasive authority for disqualification here.

The parties disagree on the nature of the Agreement. The district court seemed to conclude it was a confidentiality agreement. NPIC disputes this conclusion. NPIC contends the Agreement was nothing more than a promise that if information was exchanged, any attorney-client privilege would not be waived. Associated counters that the Agreement recited the signatories had a "joint interest

in pursuing litigation against Americold" and was most definitely a confidentiality agreement. Associated admits the word "confidentiality" was never used in the document, but argues confidentiality was intended by the parties.

Seaman & Sachs, *The Anatomy of a Joint Defense in Complex Insurance Coverage Litigation*, 39 For the Defense 22, 28 (June 1997), advises on the importance of including confidentiality provisions in joint representation agreements. Such agreements

"should include a specific and detailed definition of 'confidential' or 'privileged' information and documentation. It should include a provision requiring that these materials be kept in strict confidence and not disclosed to third parties except as provided for in the agreement. Typically, the agreement will provide that materials may be exchanged among the participating insurers and their counsel and provided to reinsurers and auditors. The agreement usually will allow disclosure to vendors, consultants, and experts retained by the parties or the defense group *provided* such individuals execute a written agreement to maintain the confidentiality of the materials and the information is disclosed to them in furtherance of the joint defense effort."

Associated has failed to show the existence of a joint confidentiality agreement here. The claims that Harrington received confidential information are tenuous at best. Associated has also failed to identify what prejudice would result if Cozen and O'Connor remain in the case.

The district court did not comment on whether the motion to disqualify Cozen and O'Connor was being used as a tactical device. See *Barragree*, 263 Kan. at 458. Motions to disqualify are often disguised attempts to divest opposing parties of their counsel of choice. *Chrispens v. Coastal Refining & Mktg., Inc.*, 257 Kan. 745, 772, 897 P.2d 104 (1995).

Motions to disqualify should be reviewed with extreme caution, for they can be misused as a technique of harassment. Such motions are often simply common tools of the litigation process, used for purely strategic purposes. The right to be represented by counsel of choice is an important one, subject to override only upon a showing of compelling circumstances. See *Barragree*, 263 Kan. at 455. "[T]he purpose of the [MRPC] can be subverted when they

are involved by opposing parties as procedural weapons." Rule 226, Scope (1998 Kan. Ct. R. Annot. 266).

## CONCLUSION

We acknowledge a significant shift in issue and party alignment that plays a role in our reversal. When the Agreement was signed, Harrington's subrogated bailment clients were pursuing the Home Insurance Company. Harrington was not involved with National Union or NPIC, Americold's primary and excess comprehensive general liability insurers against whom Associated was proceeding. Neither Harrington's clients nor Harrington participated in *Americold I*. Harrington's former clients are not parties in this proceeding. Harrington did not participate on behalf of any client in Associated's (1) settlement with Americold, (2) covenant not to execute against the assets of Americold, and (3) assignment of Americold's claims against NPIC. Americold has never been a client of Cozen and O'Connor. The interests of Cozen and O'Connor's clients have always been adverse to Americold. However, Associated and current counsel have, through the consent judgments, assignments of rights, and covenants not to execute on Americold's assets, shifted from being adverse to Americold to having consistent interests with Americold against NPIC. The posture of this case on remand from *Americold I* involves limited issues not existing when the Agreement was signed.

Since disqualification is sought under MRPC 1.9, the burden of proof is on Associated. See *Barragree*, 263 Kan. at 455. Associated has failed to show that disqualification is appropriate under the circumstances here.

NPIC filed a motion to reconsider the district court's disqualification decision. The thrust of the NPIC motion was a memorandum decision and order in *State, ex rel. Carla J. Stovall, Attorney General v. Brooke Group, Ltd., et al.*, No. 97-CV-319, Shawnee County District Court, October 15, 1997. *Brooke Group* arose from the State's tobacco litigation and was filed the day of the decision disqualifying Cozen and O'Connor. The district court here received written submissions and heard oral argument on *Brooke Group* before denying NPIC's motion to reconsider. *Brooke Group*

relied on K.S.A. 60-426 in ruling that the common-law joint defense privilege is not recognized in Kansas.

Although the parties reference the *Brooke Group* decision in their briefs, neither the four experts, the parties, nor the district court reference K.S.A. 60-426, the statutory attorney-client privilege. The presentation of this case has not focused on K.S.A. 60-426 and that statute's effect on joint representation agreements. We note that at least one state in codifying the attorney-client privilege has apparently included a joint representation privilege. See Me. R. Ev. 502(b)(3) (1998).

Our holding here is limited. The Associated plaintiffs are not Harrington's former clients. No finding was made that Associated shared confidential information with Harrington. The Agreement does not create an implied attorney-client relationship between Harrington and Associated. Cozen and O'Connor may represent NPIC in this case.

One commentator has recently noted: "Without a credible argument for recognition of the joint defense doctrine based on the language of the attorney-client privilege statute itself [K.S.A. 60-426] proponents of the joint defense doctrine are vulnerable to attack." Pace, *The State of Joint Defense Privilege*, K.A.D.C. Legal Letter No. 4, p. 5 (Dec. 1998). The effect of K.S.A. 60-426 on joint representation agreements is reserved for another day when the issue and policy considerations have been fully briefed and placed squarely before us.

Reversed.

LARSON, J., not participating.

TERRY L. BULLOCK, J., assigned.[1]

---

[1] **REPORTER'S NOTE:** Judge Bullock was appointed to hear case No. 80,786 vice Justice Larson pursuant to the authority vested in the Supreme Court by Art. 3, § 6(f) of the Kansas Constitution.